**RING v. AUTHORS' LEAGUE OF AMERICA, Inc., et al.**

**No. 90, Docket 21712.**

United States Court of Appeals
Second Circuit.

Argued Dec. 8, 1950.

Decided Jan. 9, 1951.

---

638

Wittenberg, Carrington & Farnsworth,
New York City (Philip Wittenberg, New
York City, of counsel), for Spina and oth-
ers.

Hays, St. John Abramson & Schulman, New York City (Arthur Garfield Hays, John Schulman, Osmond K. Fraenkel and William Klein, II, all of New York City, of counsel), for defendant-appellant Authors League of America.

Carl E. Ring, New York City (Edward A. Schaub, of counsel), for plaintiff-appellant Ring.

Alfred S. Julien, New York City, Greenbaum, Wolff & Ernst, New York City, for appellee-defendant.

Before L. HAND, Chief Judge, and SWAN and CHASE, Circuit Judges.

L. HAND, Chief Judge.

This cause comes on upon appeals by the plaintiff and the Authors' League of America, Inc., from the judgment in an action brought under the Anti-Trust Acts, 15 U.S. C.A. § 1 et seq., against the League and Spina, Heyman and Hannan to recover treble damages and for an injunction, because of a combination or conspiracy to restrain interstate commerce in plays. The complaint does not very clearly disclose the gist of the action, since for the most part it alleges only evidence; but the gravamen is that by means of such a conspiracy the defendants caused the failure of a musical play, "The Stovepipe Hat," in whose production the plaintiff had acquired an interest. The case was tried to a jury who answered two questions put to them by the judge as follows: "1. Have the defendants violated the Anti-Trust Laws? Yes." "2. Assuming defendants have violated the Anti-Trust Laws, has plaintiff suffered injury to his business or property by such violation of the Anti-Trust Laws? (a) By the Dramatists Guild? No. (b) By Spina? No. (c) By Heyman? No." (Hannan may be disregarded.) Upon these answers the judge dismissed the complaint so far as it asked for damages, but granted an injunction against the defendants, the important part of which forbad them to enforce against the plaintiff a contract known as the "Minimum Basic Agreement," and which directed the authors—if in the future they should seek to produce the play—to offer it to the plaintiff on as favorable terms as they offered it to others. The plaintiff appeals from the dismissal; the League appeals from the injunction. The basic question was whether the defendants by insisting upon the incorporation of the "Agreement" into the production contract became members of a conspiracy under the Anti-Trust Acts. We have already discussed that question in granting a temporary injunction in favor of the plaintiff.[1]

The facts, so far as it is necessary to state them, were as follows. On February 7, 1944, Spina, Heyman and Hannan who had theretofore written and composed "The Stovepipe Hat," made a contract with one, Gaumont, by which he was to be its "Manager" and to advance the money which might be needed to "produce" it. This contract incorporated the "Minimum Basic Agreement" of the League, to which Gaumont had become a party, as was necessary by its terms before Spina and his associates could contract with him, for they were members of the League, and the "Agreement" forbad members to contract with a "Manager," not himself a member. We need not state the terms of Gaumont's contract in detail; for the purposes of this case it is enough that "the terms and provisions" of the "Agreement" "shall apply in all matters and instances not specifically covered and provided for by this agreement"; and that in case of any divergence between it and the "Agreement," the "Agreement" shall prevail. On March 13, 1944, Gaumont and the plaintiff formed a partnership for the production of the play under this contract, and by May 4th the plaintiff had advanced $57,000 to the enterprise. There was a trial run which began in New Haven on May 18th, and ended in Boston on May 27th, when the production shut down and was never revived. Before the run began the plaintiff and Gaumont had drastically disagreed about the production of the play; and the plaintiff had unsuccessfully tried to get a contract with the authors eliminating Gaumont. Upon his failure he brought an action against Gaumont on May 6th, which was settled on the

1. Ring v. Spina, 148 F.2d 647, 160 A.L.R. 371.

12th by a stipulation, made in Spina's presence, by which Gaumont assigned to the plaintiff all his rights in the play and against the authors, together with any he might have against any of the "actors, theatres, builders, etc." In exchange the plaintiff agreed to pay Gaumont $6,659 and to save him harmless from any contracts or other obligations for which Gaumont might be liable. The plaintiff paid down $5,159 and he was to pay the balance, $1,500, either by Gaumont's securing redelivery of, or stopping payment upon, a cheque in favor of the authors which Gaumont had drawn and delivered to the League in escrow. The stipulation of settlement declared that the authors had already consented to this disposition of the cheque, whose origin was as follows. Gaumont's contract had provided that production should begin on May 7th, but that upon paying the authors $1,500 it might be delayed until October 7th. Some time before May 7th it had become apparent that the play would not be produced by that time, and to secure the extension Gaumont made out the cheque and delivered it to the League. On May 16th, four days after the action of Ring v. Gaumont was settled, Spina wrote to the League asking that the money—apparently the cheque had been cashed—should be paid to Gaumont, and the plaintiff signed the letter as witness. The League did not answer this letter till the 29th when it wrote a reply to Spina, enclosing an agreement "supplementary" to the original contract between the authors and Gaumont by which they, the plaintiff, the League and its agent (the "Dramatists Guild") were all to consent to the payment of the money to Gaumont. What became of this proposed "supplementary agreement" does not appear except that it was never signed. The plaintiff finally paid Gaumont $1,500 by a cheque which Gaumont cashed on June 7th, and by so doing he became himself entitled to the money from the League as Gaumont's surrogate; but there is no testimony that he ever made any demand for the money before he filed the complaint on June 14, 1944.

■■■ First the plaintiff claims that he is entitled to three times $1,500 because the deposit was denied him in execution of the unlawful conspiracy, having its source in the "Minimum Basic Agreement." So far as we can understand the argument, the following is its most favorable statement. Gaumont's deposit of the cheque was in part performance of the contract between him and the authors, which was invalid in toto, since it incorporated the "Agreement." Therefore Gaumont might have reclaimed the money at once, repudiating a contract which was one only in form. When Spina wrote the letter of May 16th to the League demanding that it return the money to Gaumont, the League should have unconditionally complied with it, particularly as it should have been regarded as a demand of the plaintiff as well as of Spina, because the plaintiff "witnessed" it. The League refused this demand when on May 29th it required the authors and the plaintiff to sign the "supplementary agreement," for that imposed a condition. Such a condition was justified only in case the contract was valid. The answer to this is not difficult, even though we accept as a premise that the contract was an unlawful conspiracy, because it incorporated the "Agreement." For, if the contract was a nullity, Gaumont and Gaumont alone was entitled to the cheque; he had given it upon a consideration which failed. Even so, the League was not liable until Gaumont made a demand, because, although no valid contract with the authors existed, he might want to perform it; he was not bound to repudiate. Gaumont never did demand the cheque, for Spina's letter of May 16th did not constitute a demand by him for whom Spina had no right to speak, any more than had the plaintiff. The League was not guilty of any wrong to Gaumont, when it demanded a consent from the plaintiff and the authors before paying the money. We will assume that by the plaintiff's payment to Gaumont, he was substituted in Gaumont's place, and that he might then have made a demand with which the League would have been bound to comply unconditionally. (In fact that is not true, for the League even then would have been justified in satisfying itself that Gaumont had in fact transferred his right to the

plaintiff.) But, that aside, the plaintiff never did demand payment after he had paid Gaumont. The testimony on which he relies was no more than that "an application or demand to the Guild to get the money" was made, which certainly referred to Spina's letter of May 16th. Thus it appears, even though we assume all the plaintiff's allegations to be true, that he did not prove that before June 14, 1944, the League had availed itself of the "Agreement" to impose any condition upon the return of the money. The judge was right in taking the item from the jury. It follows, however, that the judgment must not adjudicate any rights the plaintiff may have to the money, and it is to be understood that our affirmance leaves those rights unaffected.

■ The plaintiff next complains that the evidence was conclusive—contrary to the jury's verdict—that his business had suffered injury by reason of the defendants' violation of the Anti-Trust Acts; but to this it is a complete answer that he did not ask the judge so to direct the jury; and it is the well settled rule, which we have repeatedly applied, that, if a party does not ask the judge to withdraw an issue, the verdict is conclusive, save for a motion for a new trial.[2] The plaintiff's argument in the case at bar is indeed extraordinary, in view of his attorney's request at the trial for a directed verdict on all points except that "I ask that the case go to the jury on only the question of causation and damages."

■ The plaintiff's next objection is to the competency of Samrock's declaration to Ross, to which it is answer enough that Samrock was then an agent of the plaintiff, and was speaking as such. As for the exceptions to the charge, so far as they were directed to the instructions about the Anti-Trust Acts, the plaintiff won; and as for his exceptions and requests so far as they bore upon the second question, they were not necessary, for the colloquial charge covered them in all respects in which they were important. Indeed the

plaintiff does not appear to rely upon them; he now asks us to hold that the charge was weighted against him for five specific reasons, only one of which he raised at the trial, and that one was without merit. It is true that sometimes we do reverse a judgment for errors to which the aggrieved party has not objected, but ordinarily he must object at the time. Fed. Rule Civ. Proc. rule 46, 28 U.S.C.A. Certainly there was no reason to abate the rule in this case on the ground that the charge "belittled" the plaintiff's case by using the metaphor of the little boy's balloon and the elephant. If a party's sensibilities are so tender, the least we must demand is that he make known his complaint at a time when it can be remedied.

■ The last objection is to that part of the judgment which held that the plaintiff had "no right, title or interest of any kind or nature in the play 'Stovepipe Hat' except that, should the defendant authors offer the play for stage production with living players, they may not offer plaintiff terms less favorable than those offered to any other producer" with some added provisions not necessary to set forth. This raises a point so closely connected with the appeal of the League that it will be best to discuss them together. The judge reached his conclusion that the plaintiff had no interest in the play upon the assumption that the contract, by which he obtained whatever interest he did obtain, was unlawful because it was a part of the unlawful conspiracy. Upon that assumption he was right. The authors, being owners of all rights in the play, granted to Gaumont the "production" privilege only upon the terms of the contract, one of which was that he should become a member of the League, which made him a party to the conspiracy. The plaintiff, who had no contract with the authors, signed the "Agreement" on the 5th, making himself a "Manager," and thus he too became a party to the conspiracy. Although he got no assignment of Gaumont's interests until the 12th when he

**2.** Woodbridge v. Du Pont, 2 Cir., 133 F.2d 904; Flint v. Youngstown Sheet & Tube Co., 2 Cir., 143 F.2d 923; Burroughs v. United States, 5 Cir., 151 F.2d 647; Jorgensen v. York Ice Machinery Corp., 2 Cir., 160 F.2d 432.

settled the suit, we assume that Spina's presence at the settlement was an assent, and that a contract arose between them and the plaintiff. Nevertheless, that contract, being an assignment of Gaumont's was in the same terms and incorporated the "Agreement"; so that by hypothesis it was unlawful. The plaintiff repudiated it for that reason; but he was not free to repudiate it in part, keeping the right to "produce," and rejecting the conditions which the authors had imposed upon their promises, for it was not possible to apportion any part of what he received between his lawful and unlawful promises in the contract. Since, therefore, part of the consideration for the privilege to "produce" the play was to carry along the conspiracy, his repudiation of that part of the contract left the privilege without support and invalid. This is the law in New York,[3] as elsewhere.[4] It follows that the judgment was right in holding that the plaintiff had no interest in the play, if we assume that the "Agreement" was part of an illegal combination or conspiracy; and, since that is the gravamen of the action, the plaintiff cannot complain that the judgment proceeds on that assumption.

However, although we agree that the judgment was right so far, we cannot dispose in the same way of that part of it which declared that the plaintiff must have an opportunity in the future to bid for the right to "produce" the play on equal terms with anyone else to whom the authors may offer it. To do so we should have to decide that the "Agreement" in fact was a conspiracy forbidden by the Anti-Trust Acts. That point was not foreclosed by what we decided in granting the temporary injunction, for upon rehearing we said that we were only making "preliminary rulings to dispose of the particular appeal and

* * * that final rulings both of fact and law must await a definitive hearing in the District Court." Now that such a hearing has been had, it is true that we are in a position to make "final rulings"; yet it is equally true that we need do so only so far as they are necessary to a disposition of the suit. The same applies to the grant of an injunction, which should follow any finding as to the plaintiff's future rights. We hold that, once it is decided that the plaintiff has no rights in the play, he has no standing to invoke a declaration that he is entitled to an opportunity to bid for a second "production" contract, or an injunction which will secure such a right. He has no existing interest to protect beyond that of any possible newcomer in the field, and that is not enough to support either a declaration or an injunction. Our reasons for this conclusion are as follows.

The only difference between the plaintiff's position and that of such a future newcomer will be that he has had the misfortune to have lost nearly $150,000 in an unsuccessful effort to "produce" it. If that had resulted in vesting in him an interest in the play, it would give him a standing; but his repudiation of the "Agreement," incorporated as it was in the contract, has, as we have shown, left him without any such interest. We do not forget that by hypothesis he has proved himself to have been the victim of the unlawful conspiracy; and that, if a defendant has once been proved to have been a tortfeasor, ordinarily an injunction will go against him; but that is not always true. "An intent to restrain interstate commerce being shown, it is enough to justify equitable interposition by injunction if there be a dangerous probability that such injury will happen".[5] Even when the plaintiff is the United States or one of its administrative agencies, and

3. Saratoga County Bank v. King, 44 N.Y. 87; Foley v. Speir, 100 N.Y. 552, 3 N.E. 477; Marsell v. Maires, 203 App.Div. 646, 196 N.Y.S. 739, affirmed 236 N.Y. 516, 142 N.E. 265; Angresani v. Tozzi, 217 App.Div. 642, 216 N.Y.S. 161, affirmed 245 N.Y. 558, 157 N.E. 856; Brearton v. De Witt, 252 N.Y. 495, 501, 170 N.E. 119; Stone v. Young, 210 App. Div. 303, 309, 206 N.Y.S. 95.

4. Restatement of Contracts, § 607; Williston, § 1782.

5. Bedford Cut Stone Company v. Journeymen Stone Cutters' Association, 274 U.S. 37, 54, 47 S.Ct. 522, 527, 71 L.Ed. 916.

the suit is therefore brought in the public interest, or at least in the interest of a class, there must be some tangible probability that the wrong will be repeated to justify an injunction.[6] This doctrine applies with added force when the plaintiff represents only himself; he must then prove that there is a "dangerous probability" of a repetition of the wrong to him individually, and the plaintiff at bar did not prove anything more than the most tenebrous probability. He was not, and is not, by profession the "producer" of plays, but a lawyer; he does not even intimate any reason to suppose that he ever will—especially after this bitter experience—seek to "produce" another play; or that now, nearly seven years after the collapse of the first effort, the authors are in the least degree likely to revive it. On the other hand the League is naturally concerned that it shall not be held to be a conspiracy in violation of the Anti-Trust Acts. It vigorously protests its innocence and its beneficence; it is conscious of no wrongdoing, and asserts that its existence is essential to the protection of authors and composers. Such purposes would of course not protect it, if it is in fact a combination in restraint of trade or an attempted monopoly; but they are relevant in deciding whether we should decide issues in which the plaintiff has only the most shadowy interests. We hold therefore that the judgment should not have decided that, if the authors revive the play they must give the plaintiff an opportunity to "produce" it on an equal footing with anyone else, and that it should have contained no injunction. However, we hasten to add that we leave open all legal questions which such issues involve; we wish to make it entirely clear that we are not to be understood either to throw any doubt upon, or to affirm, what we said when we granted the temporary injunction; we merely decide that the necessity for such affirmance does not arise.

The judgment will be deemed modified in accordance with the foregoing opinion, and, as modified, it will be affirmed without costs to either side.

6. United States v. United States Steel Corp., 251 U.S. 417, 445, 40 S.Ct. 293, 64 L.Ed. 343; Hecht Co. v. Bowles, 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754; Walling v. Helmerich & Payne, 323 U.S. 37, 43, 65 S.Ct. 11, 89 L.Ed. 29; Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S. 419, 421, 65 S.Ct. 1242, 89 L.Ed. 1705; Securities and Exchange Commission v. Torr, 2 Cir., 87 F.2d 446; McComb v. Goldblatt Bros., 7 Cir., 166 F.2d 387; Walling v. T. Buettner & Co., 7 Cir., 133 F.2d 306.