**AFFILIATED MUSIC ENTERPRISES,
Inc., Plaintiff,**

v.

**SESAC, Inc., Defendant (Kurt A. Jadassohn, Third-Party Defendant).**

United States District Court
S. D. New York.
Jan. 30, 1958.

See also, 17 F.R.D. 509.

Wilzin & Halperin, New York City, for plaintiff, Irving Lemov, New York City, of counsel.

Lord, Day & Lord, New York City, for defendant, Sesac, Inc., Thomas F. Daly, Saul L. Sherman, New York City, of counsel.

RYAN, District Judge.

Plaintiff seeks to recover antitrust statute treble damages of $300,000 and to

enjoin defendant from engaging in "monopolistic practices" in restraint of trade; defendant by counterclaim seeks to recover damages of $250,000 for acts of alleged unfair competition and to enjoin plaintiff from continuing alleged unlawful business practices.

Plaintiff is a New York corporation organized in 1953; defendant is a New York corporation organized in 1932. Both are engaged in the business of acquiring from the owners of copyrighted music the exclusive right to license the public performance for profit of the copyrighted compositions—known as the performance rights. The bulk of these licenses is issued to radio and television broadcasters for mechanical transmission rather than live performances.

Specifically, it is alleged by plaintiff that defendant by its contracts with its affiliated "publishers" (the copyright owners) of gospel music accomplishes a pooling of copyrights and revenues in restraint of trade in violation of Section 1 of the Sherman Act; that defendant has thus acquired a "monopolistic stranglehold" in the licensing of the performance rights of shaped note gospel music with the resulting power to eliminate competition—particularly on the part of plaintiff—in violation of Section 2 of the Sherman Act; and third, that under its licenses it has imposed "tie-in" arrangements and fixed prices in violation of Section 3 of the Clayton Act (15 U.S.C.A. §§ 1, 2, 14).

Defendant has alleged that plaintiff has unlawfully interfered with its contracts, that it had wrongfully obtained confidential information from a former employee of defendant, Kurt A. Jadassohn and has itself attempted to violate the anti-trust laws.

Although Jadassohn was brought in as a third party defendant under this claim by defendant, he was not served and as to him action is not pending.

The monopoly alleged is in the performance rights in *shaped note gospel music*. Performance rights are only rights to perform music publicly for profit; they are rights completely separate and distinct from the publishing, recording or synchronization rights.

Gospel music, as the term is understood in the performance trade, is popular music with lyrics based on the four Gospels of the New Testament but with a text that expresses spiritual values in material, worldly tones and in a personal, homely vein. The music may range from a rythmical, bouncy, jazz, ragtime, blues tempo to the slower tempo of hillbilly, country music or popular sentimental ballad. It is said to be an outgrowth of white spirituals which developed in the South after the Civil War period and is still composed and widely performed there. The distinguishing feature of gospel music is its characteristic lyrics; it is a hymn "addressed to the Deity. It is praise or prayer. The word 'gospel' means good news and the gospel song is addressed to men". The music of gospel music may be printed in round notes, which is the usual note identified by its position on the musical staff, or in shaped notes where in addition to or—as the case may be—instead of identification by position the musical note is identified by its shape—a square, triangle, diamond, etc.—each note always having a particular shape.

Although much of the gospel music is composed or transposed into shaped notes, it may be written in both or either form of notation or for that matter any type of musical notation. The shaped note system is not copyrighted (any more than is the round note). Its value is that one untrained in sight reading may be more easily taught to read musical notes from their shapes, rather than from location, whereas one trained will ignore the shape or formation of the notes and rely solely on staff position. Neither sound, lyrics nor type of music is affected by the shape of the note; both sound exactly the same to the listener when properly sung.

Shaped note composition predominates in the South, where most of the gospel music is written. It is sung at the

"National Singing Conventions", for the twofold purpose of entertainment and to introduce and promote the new gospel songs through the "plugging quartettes". These quartettes, which number about 1,000, are usually trained and organized in schools maintained by the gospel music publishers where both shaped and round note singing is taught. Since gospel music partakes of the ephemeral value of other popular music, it is essential that new songs be continuously published and plugged in a steady stream. For sale to the public at these singing conventions and at other times the songs are printed usually in shaped notes, on cheap pulp paper in pocket size manila covered books. The contents of these books includes both copyrighted and uncopyrighted songs. The renditions at these conventions are "live" performances but they are frequently broadcast and often recorded, which recordings are later broadcast and televised.

The gospel music publishers have an association known as "The Gospel Music Publishers Convention". Some of its quartettes and better known interpreters —The Blackwood Brothers; The Statesmen Quartet; Joe May, "The King of the Gospel Singers"; Mahalia Jackson, "The World's Greatest Gospel Singer"; and Roberta Martin's Gospel Music Studio—publish their own catalogs containing the songs for which they are noted. There are also numerous other publications containing the latest and most recent compositions in gospel music.

Through the combination of radio and television broadcasts and the sale of sheet music and song books—gospel music has been exploited and developed into a profitable business, carried on in well defined markets. But, while the performance rights field is not concerned with the shape of the note but rather with the lyrical and musical content of the composition, the publication or printing rights field is concerned with shaped notes and makes a distinction between the two forms of notation. The reason for this is that gospel song books and sheet music are sold principally to amateurs who are able to read only from shaped notes; consequently, they demand and require compositions so printed. Music written in round notes can be transposed readily into shaped notes. Many of the composers see in the first instance their music in published shaped notes. These publishing rights are separately owned and licensed by organizations such as Hill & Range (of which more later) and have nothing to do with the "minor" or performance rights which defendant as the third largest organization in the country (the other two being ASCAP and BMI) licenses.

Performance rights are generally acquired by assignment from publishers and copyright owners for a period of years or for the life of the copyrights and licensed on a "collective pooled basis as part of a property conglomerate" with the defendant or others acting as a bargaining representative between the owner and the user. Cf. Antitrust Aspects of Merchandising Modern Music, Timberg, Law & Cont. Probls., 19, p. 294. These dealings, transactions and broadcasts are among the several states and defendant is engaged in interstate commerce.

In the terminology of the trade the bundle or total of performance rights so acquired is known as a "repertory" and the totality of the copyrights owned by any one publisher (or copyright owner) is called the publisher's "catalog".

Defendant's repertory consists of approximately 284 catalogs, representing approximately 180,000 copyrights to various types of music ranging from classical to country and hillbilly, religious and secular. Between 30 to 40 of these are gospel music catalogs consisting of approximately 40,000 to 50,000 copyrights about two-thirds of which are composed in shaped notes and the other one-third in round notes. Although defendant probably has the largest number of gospel music affiliates, these 40,000 to 50,000 copyrights represent only 20% to 30% of all the copyrighted gospel music in the market.

The contract by which a copyright owner assigns the performance rights in its compositions to defendant is known as the "Sesac Publisher Affiliation Agreement", the "publisher" being the copyright owner, and the "publication" the composition.

Under it the publisher sold, assigned and granted to defendant for the full term of the contract and any renewals "all rights of every kind and nature existing or which may hereafter come into existence, in all publications now owned or controlled, and which may be owned or controlled by the publisher during the term of the contract * * * the sole rights to publicly perform, record, transcribe, synchronize * * * ; except that the publisher retains all publishing rights consisting of the right to publish, print and vend * * * copies of the publications."

The publisher also authorized defendant to license the rights so acquired "in separate individual transactions involving any of the publisher's publications wherein separate payment is made by the licensee * * * and not for use on a collective basis" or to license "in collective transactions involving all or any of the publisher's publications with all or any of the publications of any other publisher." As to both types of licenses defendant Sesac was given the sole right to determine, fix and regulate all the terms and fees including the right to license gratuitously. Out of the revenue received from an individual license Sesac could either deduct the expenses incurred in connection with such individual transaction and share the net balance equally with the individual publisher, or it could charge these expenses to revenues received from collective licenses. Expenses incurred in collective licensing of publications of two or more publishers were to be deducted from collective revenues and 50% of the net profits remaining from such collective licenses was to be retained by defendant and the other 50% was to be allocated and distributed quarter-annually on a "basis, method, system, quota and formula and to such extent as shall be determined by Sesac from time to time, and which shall, in the reasonable judgment and discretion of Sesac, result in an equitable allocation and distribution among Sesac's affiliated publishers."

The contract provided that it was to continue for successive terms of 10 years unless at the expiration of the tenth year a three month notice of cancellation was given; but such cancellation was not to affect the term of any license—individual or collective—previously issued by defendant Sesac. In the event of cancellation, however, the publisher was to receive no further payments except that which was actually collected by defendant from an individual license. In addition, under a companion Royalty Agreement, the publisher gave defendant Sesac the right during its affiliation to make recordings of its publications and to sell, lease and license these recordings on payment of the statutory two cent per pressing.

Although as we have pointed out the Affiliation Agreement provided for individual licenses, defendant generally issued only collective or "blanket" licenses —authorizing performance by a user of its entire repertory. The reasons for this are commercial practicability. The principal users of music in public performance for profit are radio and television broadcasters; they are users en masse of all kinds of music, as distinguished from restaurants, hotels, movie sound track companies, theatres and opera companies, who do request and receive individual "or per piece" or "program" licenses. Defendant licenses 98% of the radio stations in this country or about 2,500, and recently television stations. At the time of trial it had 3,000 blanket licenses outstanding as compared to 900 per piece licenses. Before a per piece license could be granted a broadcaster it would be necessary under the defendant Sesac's requirements to ascertain its valuation which gave weight to the radio or television station, the hour, performer and type of broadcast in which the "piece" license was going to be used;

then the price would have to be approved by the Board of Directors of defendant. All this would consume a period of at least two weeks and finally defendant would have to monitor the station to insure that only the piece which was licensed and paid for was used. The total cost in time and money for this would make the fee to the "piece" user prohibitive not only for the particular performance but for the thousands of individual negotiations and licenses it would require. Quite naturally, the requests for per piece licenses from broadcasters are indeed rare. In every case it is defendant's policy to discourage a user in its request for a piece license and sell it a blanket license. As a further discouragement, defendant Sesac will not issue a list of its publications to a prospective user, but upon request will supply a list of publishers and refer the user to the publishers themselves if it insists on ascertaining the catalog.

On occasions defendant Sesac admits it has received such a request from a broadcaster. It is urged by it that this was to embarrass defendant; whether this be the reason, it is a fact that CBS—one of the largest network broadcasters—reached an impasse with defendant over a per piece license which was only resolved, after a two year separation, by a new blanket license covering both radio and television broadcasts.

Under the blanket license, a user, regardless of his needs or choice, is required to take a license covering defendant's entire repertory at an annual price fixed by defendant. Out of these pooled annual fees received from the blanket licenses, defendant, under its allocation system, arrives at each publisher's respective share by a consideration of five factors: the total number of copyrights owned by the publisher, the type of publication he owns; the number of new publications he has put out; the number of performances by the users of his publications and the publisher's seniority.

In order to better understand the nature of the controversy in issue it is necessary to go into the background of the parties and the events leading up to the suit.

Defendant Sesac is a family corporation composed of two principal stockholders—Ruth and Paul Heinecke. From its organization until 1953 it was guided and operated by the Heineckes and Kurt A. Jadassohn, who for a number of years was its vice president and later its general manager and a director with the powers of president. These three comprised the sole directing staff. Although Jadassohn's relationship with the Heinecke family was a close one (that almost of a son living in their home) he never became a stockholder and was always paid a salary.

Sesac started out as a performance rights organization for European concert and stage music. Jadassohn's principal duty was to acquire American performance rights for it in this type of music. Beginning in 1937 with the acquisition of the Stamps Baxter Music & Printing Company, a gospel music publisher, Jadassohn, aware of the popularity of this type of music on the radio stations in the South, put on a tireless campaign to acquire as many gospel music publishers for defendant as possible. His efforts met with success and in this field of performance rights hitherto untapped he was responsible for the acquisition of 28 additional publishers for defendant. As one of the motivating forces behind defendant, Jadassohn was well informed concerning all phases of its business and he personally set up the allocation system of distribution of revenue to the publishers.

On August 15, 1953, Jadassohn severed his connection with defendant, having resigned on July 1, 1953. On October 2, 1953, he entered into a contract with Jean and Julian Aberbach providing for the formation of a company to acquire and exploit performance rights to musical compositions.

Jadassohn had met one of the Aberbachs in January of 1951 when on behalf of "Hill and Range", a large publisher of sheet music, which they owned,

Aberbach had approached Sesac with the idea of acquiring from the gospel music publishers affiliated with defendant Sesac the sheet music printing rights to their music. At the time Jadassohn was of the opinion that not Hill and Range, but BMI, with which it was affiliated and which was a rival performance rights organization, was the real party behind the Aberbach proposal and that it was engaged in an attempt to take performance rights away from defendant, and flatly rejected the proposal.

Since 1950, "Hill and Range", not content with the acquisition of printing rights, had commenced a campaign to enter the performance rights field in gospel music. By 1952 it had acquired the sheet music printing rights to many of the publications owned by defendant and had written to Jadassohn thanking him for the "wonderful cooperation it had received from Sesac publishers and from Sesac in enabling us to present these songs to the Gospel buying public."

When plaintiff corporation was formed on October 9, 1953, the stock was divided equally between Jadassohn and the Aberbachs. It was provided that they were to designate two directors and Jadassohn also two, and that decisions by the Board of Directors were to be made by a 51% vote. It was further then agreed that the Aberbachs were to finance the company and Jadassohn was to use his best efforts to acquire music rights for the company exclusively, while the Aberbachs were to remain free to continue to acquire rights through other corporations owned by them, particularly "Hill and Range"; for this Jadassohn was to receive no compensation unless agreed by the Board of Directors and he never did receive a salary. The plaintiff corporation had no offices other than in some space with "Hill and Range" which also kept its books. It never produced any income; its paid-in capital never exceeded $100 and it was completely financed by loans from "Hill and Range" and BMI, which company underwrote the expense of the instant litigation.

This is explained by the fact that from March 29, 1949 through 1955 "Hill and Range" was under contract to BMI under which the Aberbachs were to acquire performance rights for BMI, to devote their exclusive efforts to exploiting and publishing compositions licensed by BMI and prohibited from acquiring without approval of BMI any interest in or rendering any services to any company other than Hill and Range and six listed subsidiaries. The Aberbachs did not obtain permission from BMI to form plaintiff company; yet "Hill and Range" is the largest music publisher affiliated with BMI and its contract with BMI was, subsequent to the formation of plaintiff, renewed, with an express personal covenant on the part of the Aberbachs—which is stated to be the inducement for BMI entering into the contract with "Hill and Range",—and which covenant of exclusive services is made of the essence and a breach thereof a breach of the contract. These circumstances combined with the fact that plaintiff company never got off the ground, that it remained completely financially dependent on "Hill and Range" leads to the inescapable conclusion that plaintiff was but an alter ego of "Hill and Range" and that its formation came within the terms of the above contract between that company and BMI. The obligations of "Hill and Range" to BMI under the contract confirm the suspicions which in 1951 Jadassohn had entertained as to the connection between "Hill and Range" and BMI.

Plaintiff, although formally organized to acquire and exploit rights to musical composition, never contemplated going into the licensing of performance rights directly such as defendant, ASCAP or BMI. It had neither the facilities nor the staff. While it represented to the trade that so long as a publisher was affiliated with Sesac it would seek to act solely as a collection agent, the activities of Jadassohn the year following the formation of plaintiff belie this assertion.

Between the latter part of August and September, 1954, Jadassohn, who was

well known and on extremely friendly terms with the gospel music publishers, made a flying tour and personally visited sixteen of the publishers affiliated with defendant. His purpose in so doing was to sign up these publishers to a contract with plaintiff; he was successful with fifteen. The first of these was Stamps Baxter Music & Printing Company, the largest gospel music publisher in the south; on September 1, 1954 Stamps Baxter assigned all performance rights in its catalog and all subsequently acquired rights to plaintiff effective upon termination of its affiliation with defendant on January 15, 1957. The contract was signed jointly by plaintiff and Hill and Range who guaranteed the financial obligations of the former. It contained the self-serving statement that the publisher had without any solicitation or inducement or suggestion on the part of Affiliated and as its sole decision decided to notify Sesac that it canceled the agreement it had with Sesac and that it had so notified it. On November 30, 1956 effective January 1, 1957 plaintiff assigned these performance rights in Stamps Baxter Company to BMI. Jadassohn then proceded to sign up the following fourteen Sesac affiliates:

Albert E. Brumley & Sons
W. Oliver Cooper
John Daniel Quartet Song Pub.
The Marion Davis Company
Firm Foundation Publishing House
S. G. Fouts
The Hall Music Co.
The Hartford Music Co.
J. M. Henson Music Co.
National Music Company
Revival Music Company
Will W. Slater
James D. Vaughan Music Publisher
R. E. Winsett

As to each the contract differed with respect to moneys to be paid and duration, although this was not known by the publishers at the time. The inducements used by him were primarily a promise of larger revenues to which they were entitled and which Jadassohn was going to procure for them from defendant. In point of fact, Jadassohn knew from his connection with defendant that in the future television broadcasters, who in the past had been licensed gratis, were going to be paying substantial fees and that consequently the revenue payable to the publishers would be substantially increased. Jadassohn probably was kept up to date on the state of revenues in defendant through his successor with whom he maintained a close friendship and who later left defendant to join "Hill and Range". All performance rights of Sesac in the compositions under the "existing agreement" were attempted to be assigned to plaintiff effective immediately for the duration of the copyrights "with the agreement that the payment of all fees payable thereunder by Sesac * * * shall be paid to you * * * which fees are hereby assigned to you." Plaintiff was to collect all payments from Sesac or any other licensing organization and pay over to the publisher all sums up to a stated amount (approximately equal to what the publisher had been receiving from Sesac); and one half of anything over that amount was to be retained by plaintiff—which under the increased television license revenues promised to be worthwhile! If the payments dropped below or ceased, plaintiff's obligations ended correspondingly. There was no obligation on the part of plaintiff other than to collect from Sesac and to remit to the publishers what had been agreed on as above.

After obtaining the respective signatures of the publisher, Jadassohn took the contracts back to the Aberbachs, who signed them and returned them to the publishers about September 13, 1955. The minutes of the plaintiff recite that plaintiff had acquired certain performance rights in musical compositions of these publishers "subject to the existing agreements between said Publisher and Sesac Inc." Prior to receipt of the executed contract one of the publishers, Henson & Co., notified plaintiff that it withdrew its offer, but this was ignored by plaintiff and Henson was sent the

executed agreement. No other publishers were approached by Jadassohn; as a matter of fact, this was the sole business activity in which plaintiff engaged.

As the notices of cancellation and assignment to plaintiff of revenues payable "subject to our present agreement with you" began pouring in to defendant's office, defendant began work to counteract the disastrous effect of Jadassohn's journey through the South. Special employees were selected to call on the publishers to win them back. They were told that they had given away their property without compensation, that additional revenues would be forthcoming without any necessity of sharing with plaintiff; that plaintiff was not equipped to represent them; that plaintiff's intervention would adversely affect their interests; and that they should not have signed without first notifying defendant. Upon request, these publishers were given a form of cancellation to be sent to plaintiff.

Jadassohn in the meantime was not idle; informed of the proposed visits of defendant's employees, he was busy exhorting the publishers by phone not to succumb to the entreaties of defendant.

In the midst of this activity, the publishers retained an attorney by the name of Locke to represent them at a conference to be called at which Jadassohn on behalf of plaintiff, and Sesac employees Myers and Prager, on behalf of defendant, would present their side of the story in order that the publishers might decide what course of action would be best for them.

Defendant's position was that the contracts were void for want of consideration and could be set aside, and that Jadassohn had misused his position with defendant to deceive the publishers as to their rights. Jadassohn's position on behalf of plaintiff was that the publishers needed protection and representation in the negotiation of the rights to their publications and that he was there to get the best he could for them from any organization, although he had unequivocally stated that he would never permit defendant to bid for any of the performance rights he might have and that he was "through with them."

The upshot of the conference was that all fourteen publishers through the attorney Locke notified both plaintiff and defendant that they regarded their contract with plaintiff as rescinded and null and void and returned the advance payments which had been made them by plaintiff as evidence of its pure intentions.

It is against this picture of competition between defendant attempting to hold on to its publishers and plaintiff acting as agent for a rival licensing organization attempting to wrest them away, that each side has charged the other with unlawful and damaging acts.

The charge made by plaintiff is that defendant has monopolized the licensing of performance rights in shaped note gospel music; the defense, that performance rights in shaped note gospel music is not a separate, identifiable market on which defendant could have a monopoly, but an indivisible segment of the larger market of performance rights in all popular music or, at the very least, in gospel music of both notations.

■■ The commerce involved is licenses in performance rights; the function of such licenses is "listening"; the test to be applied in determining what is the "relevant market" is that of "reasonable interchangeability * * * price, use and qualities considered." United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 404, 76 S.Ct. 994, 1012, 100 L.Ed. 1264; United States v. International Boxing Club of New York, D.C., 150 F.Supp. 397. Specifically, are performance rights in shaped note gospel music a reasonable substitute for performance rights in round note gospel music? The answer is that they are an exact substitute. The function of the notes here is concerned with lyrics and melody; a composition whether written in shaped or round notes sounds identical and cannot be distinguished by the listener; the form of the note has no effect on the

sound; the performance rights are licensed and purchased without reference to the form of notation and are completely interchangeable. There is complete cross-elasticity of demand between the performance rights in shaped and round note gospel music. For antitrust considerations, performance rights in shaped note gospel music is not the "relevant market", and though defendant might control the performance rights in shaped note gospel music it cannot have a monopoly in the relevant market.

■■ " * * * where there are market alternatives that buyers may readily use for their purposes, illegal monopoly does not exist merely because the product said to be monopolized differs from others. * * * The varying circumstances of each case determine the result. In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of trade or commerce', monopolization of which may be illegal." United States v. E. I. du Pont de Nemours & Co., 351 U.S. 394–395, 76 S.Ct. 1006–1007.

In contrast to the performance rights or listening function, there is a difference in the form of notation in the publishing or printing rights of gospel music which is the reading function. Here, there is no interchangeability for a large segment of the users and purchasers for one trained to read only shaped notes cannot read round notes and will therefore not demand or be able to substitute one for the other. In the commerce of printing and publishing rights, there is a separate identifiable market in shaped note gospel music. But we are not here concerned with printing or publishing rights.

Continuing to apply the same tests, the relevant market embracing performance rights in gospel music emerges as the separate and distinct market. There is a demand—regional in fact—for performance rights in gospel music which cannot be satisfied by substituting performance rights in other popular music. Gospel music and its unique and easily recognizable characteristics, its special composers and interpreters, its special audiences and publications, and its very treatment by defendant as a special asset and source of revenue, is a product the performance rights of which cannot be substituted by performance rights for any other type of music. For antitrust considerations the "relevant" market here is performance rights in gospel music.

■ "Monopoly power is the power to control prices or exclude competition. * * * Price and competition are so intimately entwined that any discussion of theory must treat them as one. It is inconceivable that price could be controlled without power over competition or vice versa." United States v. E. I. du Pont de Nemours & Co., 351 U.S. 391–392, 76 S.Ct. 1005.

■ While the statute prohibits monopolization of any part of trade or commerce, the size of the market is not conclusive of monopoly or absence of it. An "appreciable part" of the market must be in the hands of the defendant, before he can be found to control prices and exclude competition. What is an appreciable part will vary with the market under consideration for the illegal power must be appraised in terms of the competitive market for the product. In United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416, 424, in discussing defendant's control of the aluminum market, it was said that while 90% control was enough to consititute a monopoly, it was doubtful whether sixty or sixty-four percent would be enough and certainly thirty-three percent is not. In United States v. E. I. du Pont de Nemours & Co., 20% control of the flexible materials market was not enough. See also, United States v. Yellow Cab Co., 332 U.S. 218, 226, 67 S.Ct. 1560, 91 L.Ed. 2010.

Defendant's power must be appraised from its position in the performance

rights gospel music market. A spot check survey of gospel music catalogs, publications and recordings submitted by defendant, while not accurate as to the actual figures since there were duplications, reveals the following percentages which I have accepted as accurate in the absence of any evidence to the contrary: of the gospel music recordings listed in the catalogs of 8 major commercial recording companies—the vast majority of the gospel music performed over the radio—defendant has performance rights on from 7 to 38% of the compositions; of the gospel music made available to the broadcasters by four leading transcription services defendant holds the performance rights on 0% to 31%; and of the sheet music and recordings sold in the South defendant holds the performance rights on 22% to 39% of the compositions. The total average percentage of gospel music performance rights controlled by defendant is 20% to 30%; the rest are in the public domain and in the hands of other organizations. The performance rights to compositions of some of the largest gospel music publishers are to be found in the repertories of its rivals ASCAP and BMI—among them some formerly associated with defendant.

Plaintiff's contention that defendant had monopolized the performance rights market in gospel music was directed to the market in performance rights to shaped note gospel music, which I have concluded was not the relevant market for considerations of monopoly. There is no evidence that by its market position in the performance rights of gospel music—a 20% to 30% control—which is not an appreciable part of the relevant market, defendant had the power to regulate prices and exclude competition, in violation of Section 2.

However, defendant's affiliation agreement is the classic pooling of rights and sharing of revenue struck down as violative of Section 1 of the Sherman Act in Alden-Rochelle, Inc., v. A. S. C. A. P., D.C., 80 F.Supp. 888, and Witmark & Sons v. Jensen, D.C., 80 F.

Supp. 843. Irrespective of the amount of trade or commerce, this type of contract has been held to constitute an unlawful restraint of trade because: 1) it makes it possible for one copyright owner to set the price and share in the revenue derived from another's copyright thus adding to the monopoly of the copyright; 2) it cuts off competition among the affiliated copyright owners to market and exploit their works since they agree on a fixed price and share in the common profits; and 3) it tends to make the affiliated group too effective in resisting competition from unaffiliated copyright owners. A "copyright may no more be used than a patent to deter competition between rivals in the exploitation of their licenses." United States v. Paramount Pictures, 334 U.S. 131, 144, 68 S.Ct. 915, 923, 92 L.Ed. 1260; United States v. Line Material Co., 333 U.S. 287, 68 S.Ct. 550, 92 L.Ed. 701. The blanket licensing employed by defendant is similar to the "block-booking" which was condemned in the Paramount case, and while defendant does not refuse to issue a per piece license it gives the user, who must choose the blanket license as the lesser of two evils, no "genuine economical choice" between the two types of licenses. The advantages derived from collective licenses and the numerous practical difficulties attendant on individual licenses do not absolve collective licenses from the antitrust laws. Witmark & Sons v. Jensen, supra; Fashion Originators' Guild v. F. T. C., 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949. Neither do the good motives of the parties nor the reasonableness of the prices set. United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700.

It is true that the Alden and Witmark cases also involved a monopoly finding, but the holdings are clear that pooling agreements are *per se* violations of the antitrust laws.

Assuming then that defendant's agreements violate Section 1 of the Sherman Act and Section 3 of the Clayton Act, is plaintiff a person who has been injured in its business or property as a

result of such violation under Section 4 of the Clayton Act? It is clear it is not.

We start out with the premise that the injury must be a violation of a legal right and that it must have resulted from acts of the defendant directed against plaintiff. Keogh v. Chicago & N. W. Ry. Co., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183; Admiral Theatre Corp. v. Paramount Film Distributing Co., D.C., 140 F.Supp. 686.

Plaintiff has summed up its loss as follows:

"The total value * * * of the fourteen contracts which AME had acquired and which were cancelled, the two contracts which plaintiff was in the process of negotiating and was prevented from consummating, and the future potential contracts which the plaintiff would have been able to bid and compete for, but for the monopolistic power and practices of the defendant * * *"

But plaintiff had not the facilities to and did not intend to bid and compete for the assignment of performance rights from publishers in order to license them directly to users. It did intend to act as an intermediary, for profit, between a publisher and a licensing organization, until it could procure assignment of those rights. In view of its genealogy, it would be naive to assume that any organization other than BMI would eventually succeed to defendant's assigned performance rights. There is no doubt that plaintiff was "seeking to free the publishers from defendant's grip" in order to place them within its own grip. In effect what plaintiff was prevented from doing by defendant's "monopolistic practices" while the contracts with defendant were in effect, was to inject itself into the licensing scheme it alleges was unlawful in order to take to itself a share of the profits and thus cut further into the insufficient revenue it claims defendant was turning over to the publishers. Far from attempting to rescue the publishers it was seeking to profit from their affiliation with defendant until such time as defendant could be replaced by BMI, as it was in the case of Stamps Baxter Company. A perfect situation of a plaintiff "blow hot or cold with illegality." Mid-West Theatres Co. v. Co-Operative Theatres, D.C., 43 F. Supp. 216, 224.

All that plaintiff has pointed out as unlawful in the affiliation agreements presumably might result in injury to the publishers; certainly, the exaction of annual blanket fees on collective licenses regardless of the needs or requirements of a user might result in injury to the users. Plaintiff is in neither category; it was not aimed at and it was not hit; it was not even in the target area, but rather alongside the marksman whose place it sought to fill (First National Pictures v. Robison, 9 Cir., 72 F.2d 37, certiorari denied 293 U.S. 609, 55 S.Ct. 125, 79 L.Ed. 700, rehearing denied 293 U.S. 631, 55 S.Ct. 141, 79 L.Ed. 716; Ring v. Authors' League, 2 Cir., 186 F.2d 637, certiorari denied 341 U.S. 935, 71 S.Ct. 854, 95 L.Ed. 1363; Productive Inventions v. Trico Products Corp., 2 Cir., 224 F.2d 678, certiorari denied 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818.

It is not a question of "unclean hands" for if plaintiff had been a victim of defendant's unlawful practices the fact that it had also been guilty of illegal conduct would not immunize defendant against liability. The antitrust laws are more concerned with the injury to the public than they are with the morals of the private litigants. Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259, 95 L. Ed. 219; Trebuhs Realty Co. v. News Syndicate Co., D.C., 107 F.Supp. 595. Here it is more than that—for plaintiff's theory is a frank confession that but for defendant's alleged stranglehold on the gospel music market, it believes that it would have succeeded in supplanting defendant as a monopolist. To permit recovery would be to have this Court place "its imprimatur on a scheme which involves * * * a violation of the anti-trust laws." Mercoid Corp. v. Mid-

Continent Inv. Co., 320 U.S. 661, 670, 64 S.Ct. 268, 273, 88 L.Ed. 376; Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 315 U.S. 788, 62 S.Ct. 402, 86 L.Ed. 363.

The complaint must be dismissed.

There is no question but that Jadassohn—who was known among the Southern publishers as "Mr. Sesac"—was successful in luring them away from defendant by reason of the knowledge of the business he had acquired and the contacts he had made while in defendant's employ. Through his enterprise and salesmanship he had brought the publishers under the Sesac aegis, but he was not thereafter irrevocably committed to leave them there. Jadassohn, short of unlawfully interfering with contractual relations, could take them with him to whatever organization with which he might later become associated. To hold he could not do so would certainly freeze competition and quash initiative. The only so-called trade secret, which defendant claims Jadassohn used to the advantage of plaintiff was his knowledge of the allocation system employed by defendant. This, while perhaps to be jealously guarded from a potential competitor could not justifiably be kept from the publishers whose property was producing the revenue; as for their names and contracts, these were public documents recorded in the Copyright Office.

While the activities of Poklitar (Jadassohn's so-called informer) might shock a sensitive soul, in this field of enterprise, such "espionage" does not cause surprise and much less does it constitute actionable wrong. Neither Jadassohn nor Poklitar were parties to the suit, but assuming they had acted as agents of plaintiff in unlawfully interfering with defendant's contracts, there was no injury to defendant. True, defendant did lose to BMI one of its largest gospel music publishers—Stamps Baxter—through the good offices of Jadassohn, but this did not become effective until his contract with defendant expired. On the other hand, defendant appears to have been no novice at the business of acquiring its rivals' publishers—undoubtedly in the same general fashion—for it bragged in one of its enthusiastic letters that in a few years it had acquired six associates of BMI and thirteen of ASCAP! A healthy sign of competition—at any rate among the Big Three!!

The complaint is dismissed on the merits; the counter-claim is also dismissed; let the clerk enter judgment for defendant on the complaint with costs.