GREENSPUN v. McCARRAN et al.

No. 1002.

United States District Court
D. Nevada.

June 6, 1952.

Washington, D. C., for plaintiff H. M. Greenspun.

A. W. Ham, Sr. & A. W. Ham, Jr., Las Vegas, Nev., William K. Woodburn, Woodburn, Forman & Woodburn, Reno, Nev., Harold C. Faulkner, Melvin, Faulkner, Sheehan & Wiseman, San Francisco, Cal., for defendants Belden Katleman and others.

Jones, Wiener & Jones, Las Vegas, Nev., W. Alan Thody, Los Angeles, Cal., for defendants Desert Inn Inc. and others.

J. A. Donnelley, San Diego, Cal., of counsel for Desert Inn Inc. and M. B. Dalitz.

Richard W. Blakey, McCarran, Rice, Wedge & Blakey, Reno, Nev., for defendant Patrick A. McCarran.

Hawkins, Cannon & Coulthard, Las Vegas, Nev., Louis B. Whitney, Phoenix, Ariz., for defendants Gus Greenbaum and Flamingo Hotel, Inc.

FOLEY, District Judge.

Since July 1, 1950, the plaintiff, H. M. Greenspun, has owned and published the Las Vegas Sun, hereinafter referred to as the "Sun", as a daily newspaper in the City of Las Vegas, Clark County, Nevada. Las Vegas has a population of more than 25,000. The only other daily newspaper service provided for Las Vegas and Clark County during the period of the Sun's publication was and is owned by the Southwest Publishing Company, a corporation. That company is the publisher of the Las Vegas Evening Review Journal. For several years prior to the publication of the Sun, the Las Vegas Evening Review Journal was the only local daily newspaper published in Las Vegas and Clark County. If, for any reason, the Sun discontinued publication, the Southwest Publishing Company would be sole occupant of the local daily newspaper field in Las Vegas and vicinity.

Plaintiff alleges a conspiracy in restraint of interstate commerce in violation of § 1 of the Sherman Anti-Trust Act, 15 U.S.C.A. § 1, and a combination and conspiracy attempting to monopolize such commerce in violation of § 2 of the Act, 15 U.S.C.A. § 2.

The matter presently before the Court is plaintiff's application for a preliminary in-

George E. Marshall, Las Vegas, Nev., William A. Roberts, Roberts & McInnis,

junction restraining defendants from continuing, pursuant to an alleged conspiracy, acts and practices which would result in a monopoly.

At the hearing and without objection, the Court considered the order to show cause as a motion for a preliminary injunction.

■ The case of Lorain Journal v. United States, 342 U.S. 143, 72 S.Ct. 181, answers defendants' contentions as to the applicability of the antitrust laws.

The Las Vegas and Clark County defendants are engaged in gambling enterprises in conjunction with restaurants, bars, resort hotel facilities and the furnishing of entertainment.

The gravamen of the controversy is the alleged withdrawal of advertising by concerted action.

Exhibits Nos. 1 to 8 inclusive, copies of the Sun, illustrate the quantity and character of the advertising matter. With but slight exception, no advertising mentions gambling. Certain defendants in their argument on the motion for preliminary injunction raise the defense of "unclean hands." They cite Maltz v. Sax, 7 Cir., 134 F.2d 2. Plaintiff in that case was engaged in making and selling gambling devices. The case has no application. Here, the plaintiff is engaged in the newspaper business.

Paraphrasing the statement of District Judge Freed in the Lorain case, U. S. v. Lorain Journal, 92 F.Supp. 794, on page 798: Having the plan and desire to injure the Sun, no more effective and more direct device to impede the operations and to restrain the commerce of the Sun could be found by the conspirators than to cut off its bloodstream of existence—the advertising revenues which control its life or demise. In this Court's opinion the Sun is engaged in interstate commerce and therefore entitled to the protection of the antitrust laws.

■ The question as to whether the defendants were authorized under the circumstances shown here to withdraw their advertising is answered by Judge Freed in the Lorain case, 92 F.Supp. 794, on 797:

"The defendants have urged upon the Court, in another connection, the principle that a single trader has a right to deal or to refuse to deal with whomever it pleases for whatever reason it pleases, so long as it does not combine with others to achieve its end. The classic statement of that doctrine recognized the right only in 'the absence of any purpose to create or maintain a monopoly'."

■ The abrupt cancellation of the advertising matter here could very well produce the result of bringing about a discontinuance of the publication of plaintiff's newspaper. It was held in United States v. Patten, 226 U.S. 525, 33 S.Ct. 141, 145, 57 L.Ed. 333, that "[persons] by purposely engaging in a conspiracy which necessarily and directly produces the result which the statute is designed to prevent, they are, in legal contemplation, chargeable with intending that result." The evidence here indicates such a purpose and the conspiring defendants must be held to have intended the necessary and direct consequences of their acts.

A court of equity may require affirmative action when the circumstances demand it. In Re Lennon, 166 U.S. 548 on 556, 17 S. Ct. 658, 661, 41 L.Ed. 1110, the Supreme Court said:

"Perhaps, to a certain extent, the injunction may be termed mandatory, although its object was to continue the existing state of things, and to prevent an arbitrary breaking off of the current business connections between the roads. But it was clearly not beyond the power of a court of equity, which is not always limited to the restraint of a contemplated or threatened action, but may even require affirmative action, where the circumstances of the case demand it."

The motion for preliminary injunction having come on regularly for hearing, and evidence having been presented in behalf of plaintiff and in behalf of the defendants appearing herein, and the Court, after having considered the same, makes its findings of fact and conclusions of law as follows:

### Findings of Fact

1. That the Court has jurisdiction of this action by virtue of the provisions of 15 U.S. C.A. §§. 1–26.

2. That since July 1, 1950, plaintiff, H. M. Greenspun, has owned and operated a daily newspaper known as the Las Vegas Sun in Las Vegas, Clark County, Nevada. That said newspaper is produced and published in a modern building equipped with rotary presses capable of production of 20,000 copies per hour and with a full complement of linotypes and other equipment; that the daily circulation of said newspaper is about 8,000 copies and its advertising includes national display advertising, local display advertising and classified advertising; that advertising received from hotels, restaurants and downtown clubs approximated 30 to 35% of the total display advertising.

3. That the newspaper of the plaintiff, the Sun, is distributed through street sales in Las Vegas, over routes throughout Las Vegas and territory adjacent in Clark County, in the towns of Boulder City and Henderson and nearby small communities. That a substantial number of copies of said newspaper are shipped to Reno, Carson City and other Nevada communities outside of Clark County, and approximately 500 copies are distributed daily within Nevada by mail; that daily copies of the newspaper are distributed to 31 states of the United States, the District of Columbia, and foreign countries. That the Sun subscribes for and receives United Press, an international and national news service, sports wire and news service, and nationally distributed columns, features, comics and cartoons originating out of Nevada; that news originated by the Sun is transmitted nationally through United Press Service; that newsprint, ink and supplies consumed in the paper, including matrices for national advertising, are received from many states of the United States and from foreign countries; that the Sun is engaged in interstate commerce.

4. That the defendants who have been served and appeared, other than Patrick A. McCarran, are engaged as follows: Some in the ownership and operation of one or more of a group of five large hotels located in what is known as the "Strip" area of Clark County adjacent to Las Vegas; and others in the operation of establishments in downtown Las Vegas; and certain of said defendants participate in the ownership and operation of establishments in the Strip area and in downtown Las Vegas.

5. That the five large hotels located in the Strip area are large and luxurious establishments, having an aggregate of more than 1,000 transient rooms, extensive dining rooms catering to the general public, bars and other places of refreshment, shops, stores and rooms for gambling.

6. That for a period of time prior to January 1, 1952, the following hotels in the Strip area advertised shows, entertainment, restaurant facilities and other accommodations, and the following establishments in the downtown area operated by certain defendants advertised restaurants, bars, amusements and other facilities: Flamingo Hotel, Inc., a corporation; Hotel Last Frontier, a corporation; Desert Inn Inc., a corporation; Elranco, Inc., a corporation; Thunderbird Hotel Co., a co-partnership; Golden Nugget Inc., a corporation; Monte Carlo Incorporated, a corporation; Boulder Club, a co-partnership; Pioneer Club, a co-partnership; and Las Vegas Club, a co-partnership.

7. That it was the established practice of the Strip hotels to hold meetings at which were discussed and decided common problems including general advertising policies; that such a meeting was held on or about March 22, 1952, at which the following defendants were represented: Flamingo Hotel, Inc.; Desert Inn Inc.; Hotel Last Frontier; and Thunderbird Hotel Co., a co-partnership; and Elranco, Inc. That at said meeting the attending defendants agreed to cancel all individual advertising in the Sun by the Strip hotels, and Marion B. Hicks, co-partner of Thunderbird Hotel Co., was designated to attend a meeting of representatives of the downtown establishments.

That on March 22 or 23, 1952, a meeting of representatives of the downtown estab-

666

lishments, which then advertised in the Sun, was held and Marion B. Hicks, representing the Strip hotels, was present and conveyed to the said downtown establishments the intention of the Strip establishments to cancel advertising in the Sun; that at said meeting it was agreed to join with the Strip hotels in a conspiracy to cancel advertising in the Sun; that as the result of said meeting of March 22 or 23, 1952, all of the five hotels of the Strip area and those of the downtown establishments, which had been carrying individual advertising in the Sun, did, on March 24, 1952, or within a few days thereafter, cancel said advertising.

8. That the defendant advertisers did not contemplate curtailing or reducing advertising or advertising expenditures in the Sun prior to March 22 or 23, 1952, and that the curtailment and cancellation of advertising done on or shortly after March 24, 1952, was not done for economic reasons but was done pursuant to the conspiracy formed for the purpose of injuring the Sun and driving it from the news field and to thereby create a monopoly in the Las Vegas area to the detriment of the inhabitants thereof.

9. That the revenue which would have accrued to the Sun from a continuation in force of the Strip hotels and downtown display advertising at the rates in effect March 24, 1952, was not less than $200 each day the Sun was published, or $5,200 or more per month, which revenue was lost as the result of such cancellation.

10. That if the loss of such revenue continues, the plaintiff will suffer irreparable injury in that such loss will endanger the existence of the Sun and will threaten its ability to continue as a daily newspaper in Las Vegas, Nevada, and vicinity.

11. That if the advertising defendants continue their collective action of depriving plaintiff and his newspaper, the Sun, of the cancelled advertising, such loss of revenue will tend to give to the owners and proprietors of the Las Vegas Evening Review Journal a monopoly of the local and interstate daily newspaper business published in Las Vegas, Nevada, to the detriment of the plaintiff individually and to the inhabitants

of the area by the elimination of a competitive newspaper and advertising medium.

## Conclusions of Law

As conclusions of law from the foregoing facts, the Court decides:

1. That on or about March 22, 1952, authorized representatives of the following defendants: Flamingo Hotel, Inc.; Desert Inn Inc.; Hotel Last Frontier, a corporation; Thunderbird Hotel Co., a co-partnership; and Elranco Inc., formed a conspiracy for the purpose of cancelling their individual advertising in the Sun; that on or about March 22 or 23, 1952, Golden Nugget Inc.; Monte Carlo Incorporated; Boulder Club, a co-partnership; Pioneer Club, a co-partnership; and Las Vegas Club, a co-partnership, the downtown establishments which then advertised in the Sun, joined in said conspiracy to cancel advertising in the Sun with the defendants, the five large hotels located in the Strip area.

That said conspiracy was formed for the purpose of bringing about a united withdrawal of the conspiring defendants' advertising in the Sun with the intention on the part of each and of all of said conspirators to cause the abandonment of the publication of the Sun and thereby create a monopoly in the daily newspaper field in Las Vegas and vicinity in favor of the only competitor of the Sun, the Las Vegas Evening Review Journal, all to the detriment of the inhabitants of Las Vegas and vicinity.

That pursuant to said conspiracy, the said conspiring defendants did, by united action, on or about March 24, 1952, withdraw from the Sun all of their individual and display advertising for the purposes aforesaid.

2. That unless a preliminary injunction is issued, the plaintiff individually, and the public, the inhabitants of Las Vegas and Clark County, Nevada, will suffer irreparable injury in that unless prevented by order of this Court, the conspiring defendants will continue their collective action of depriving plaintiff and his newspaper, the Sun, of the cancelled advertising and the loss of revenue which would result therefrom; that the loss of such revenue will endanger the existence of the Sun and will threaten its ability to continue as a daily

newspaper in Las Vegas, Nevada, and vicinity, and will tend to give to the owners and proprietors of the Las Vegas Evening Review Journal a monopoly of the local and interstate daily newspaper business published in Las Vegas, Nevada, and surrounding area to the detriment of the plaintiff individually and to the inhabitants of the area by the elimination of a competitive newspaper and advertising medium.

It is therefore ordered, adjudged and decreed that the motion of the plaintiff for a preliminary injunction be, and the same hereby is, granted and that, upon the plaintiff giving bond with good and sufficient sureties in the sum of $2,500 for the payment of such costs and damages as may be incurred or suffered by any party who is found hereafter to have been wrongfully enjoined or restrained, a preliminary injunction issue for the reasons hereinabove set forth enjoining and restraining the defendants: Flamingo Hotel, Inc.; Elranco, Inc.; Hotel Last Frontier, a corporation; Desert Inn Inc.; Golden Nugget Inc.; Monte Carlo Incorporated; Marion B. Hicks, Jacob Kozloff, L. B. Scherer and Clifford A. Jones, doing business under the fictitious name of Thunderbird Hotel Co., a co-partnership; Clifford A. Jones, Ed L. Crawford, Milton B. Page and L. B. Scherer, doing business under the fictitious name of Pioneer Club, a co-partnership; L. B. Scherer, Leo Healy and A. F. Shellang, doing business under the fictitious name of Las Vegas Club, a co-partnership, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise, from continuing to refrain and continuing to refuse to tender to plaintiff for insertion and publication in his newspaper, the Las Vegas Sun, advertising matter substantially similar in frequency, size and classification to that published in the Las Vegas Sun during the month preceding March 24, 1952, by or on behalf of said defendants, and from refraining and refusing to pay for such advertising at rates in effect when the advertising of the said defendants was withdrawn on or about March 24, 1952.