**AFFILIATED MUSIC ENTERPRISES, INC., Plaintiff-Appellant and Appellee,**

**v.**

**SESAC, INC., Defendant-Appellee and Appellant.**

**No. 245, Docket 25148.**

United States Court of Appeals Second Circuit.

Argued April 14, 1959.

Decided June 8, 1959.

———◆———

Irving Lemov, New York City (Michael Halperin and A. Halsey Cowan, of Halperin, Morris, Granett & Cowan, New York City, on the brief), for plaintiff-appellant and appellee.

Thomas F. Daly, of Lord, Day & Lord, New York City (Saul L. Sherman, of Lord, Day & Lord, New York City, on the brief), for defendant-appellee and appellant.

Before CLARK, Chief Judge, and SWAN and MOORE, Circuit Judges.

CLARK, Chief Judge.

In the court below Affiliated Music Enterprises, Inc., charged defendant, Sesac, Inc., with violations of §§ 1 and 2 of the Sherman Act and § 3 of the Clayton Act, 15 U.S.C. §§ 1, 2, 14, and Sesac charged AME with several instances of unfair competition. From Judge Ryan's decision, D.C.S.D.N.Y., 160 F.Supp. 865, dismissing the claims of each against the other, both parties appeal.

Sesac is a family corporation owned and controlled by Paul and Ruth Heinecke. It is one of three major licensing organizations for music performance rights in this country. The others, each larger than Sesac, are the American Society of Composers, Authors and Publishers (ASCAP) and Broadcast Music Incorporated (BMI). These companies acquire exclusive performance rights to copyrighted music from owners of copyrights, police infringements of these rights, and license others to perform the music. In the case of Sesac, at least, these licenses are sold principally to radio and television broadcasters; and it generally offers them only blanket or conglomerate licenses authorizing the performance of all works it controls. The copyright owners are paid royalties out of these licensing proceeds computed on a rather complex allocation system.

AME, the plaintiff below, was organized in 1953; it sought to enter the performing rights field by acquiring rights which it intended to exploit not by direct licensing to users as do Sesac, ASCAP, and BMI, but by exclusive licensing to one of these three organizations. Half its stock is owned by Jean and Julian Aberbach, and the remainder by Kurt A. Jadassohn. The Aberbach brothers are the owners of Hill & Range Songs, Inc., a large music publisher; and Jadassohn is a former officer of Sesac.

While with Sesac, Jadassohn initiated an extensive campaign of acquiring performance rights to "gospel music." This is a type of music which is apparently quite popular in the South and in rural areas throughout the country. It is characterized by lyrics dealing with spiritual and religious subjects in a personal, homely vein sung to distinctly secular rhythms and tunes. By 1953 Sesac held rights of more than a score of gospel music publishers under contracts terminable at ten-year intervals. Many of these publishers had personally dealt only with Jadassohn in their business relations with Sesac. In AME's sole effort to break into the performing rights industry Jadassohn canvassed a number of them, and on promises of increasing their royalties and various representations about Sesac's financial condition he succeeded in acquiring blanket assignments of performing rights from fifteen of seventeen publishers he solicited. In fact, the publishers would soon have received increased royalties in any event, since, as Jadassohn knew, Sesac had just negotiated a license agreement with the television industry, which had theretofore been carried along gratis by all three performing rights organizations. When word reached defendant of AME's activities it, too, sent representatives into the field. Ultimately, after a meeting between representatives of the publishers, Jadassohn, and a Sesac representative, all but one of the fifteen who had signed

with AME elected to cancel those contracts and remain with Sesac.

In the court below and on this appeal plaintiff's principal contention is that Sesac monopolized the market for the acquisition of rights for the performance of gospel music and purposely drove AME out of the industry to maintain its position of monopoly and to restrain competition in that market in violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. It also charges that Sesac's pooling of its performance rights and its practice of granting broadcasters only conglomerate licenses covering all rights it owns are prohibited by the Sherman and Clayton Acts, 15 U.S.C. §§ 1, 14.

■ Far from showing a restraint of trade or a monopolization, however, the evidence adduced below reveals only a noteworthy competitive struggle between two giants in the performing rights industry. Judge Ryan found that AME was but the alter ego of the Aberbach brothers' substantial publishing house Hill & Range Songs, Inc., which was in turn closely affiliated with BMI. This finding is amply supported by the evidence. AME was financed wholly by loans from Hill & Range and had only $100 of paid-in capital, while its office was a desk in the Hill & Range office. While soliciting performance rights for AME, Jadassohn also signed up publication rights for Hill & Range. Moreover, under the Hill & Range-BMI contract in force from 1949 to 1955, Hill & Range and the Aberbachs personally covenanted that all performance rights they might acquire would be assigned to BMI unless previously assigned to another performing rights organization. And BMI itself has financed this litigation.

Against this background of fierce competition between BMI and Sesac, AME's charges of antitrust violations must fall of their own weight. There is a complete absence of any showing that Sesac has that power over price or to exclude a competitor which is the essence of the violations charged. United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264;

United States v. Griffith, 334 U.S. 100, 107, 68 S.Ct. 941, 92 L.Ed. 1236; United States v. United Shoe Machinery Corp., D.C.Mass., 110 F.Supp. 295, 297, 342, affirmed United Shoe Machinery Corp. v. United States, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910. The temporary success of AME's raid on Sesac's publishers suggests that these publishers do not feel closely tied to defendant on a permanent basis; and Sesac's ultimate thwarting of AME's efforts was accomplished not by the force of its existing contracts or by economic coercion, but by fair and open salesmanship and an outbidding of plaintiff's offers to the publishers.

It is significant that AME was able to retain the largest of the publishers it initially signed up, despite the power it asserts defendant has; and it retained this publisher simply by offering it favorable terms, including a guarantee of the AME contract by the financially sound Hill & Range Songs, Inc., which it did not make available to the smaller firms.

The record below similarly lacks evidence even as to Sesac's position in the market that it is alleged to have monopolized. Judge Ryan's findings do seem to support the conclusion that performance rights in gospel music constitute the relevant market for purposes of this case. Thus he found the music distinct from other popular music, and without substitutes which will equally satisfy its devotees. But the popularity of the typical gospel tune is quite short-lived, and its performance rights of value only for a small portion of the copyright term. There is no evidence of the proportion of currently valuable performance rights Sesac owned at any time relevant to this litigation.

■ Moreover, Sesac's pooling of the performance rights assigned to it and its offering to broadcasters of only conglomerate licenses authorizing the performance of all works it controls, which AME attacks as *per se* violations of the Sherman and Clayton Acts, have, we feel, no relevance at all to this litigation. As Sesac's pool of performance rights includes all its acquisitions, of which rights

to gospel music comprise only a small portion of the total, these practices do not by themselves tend to prove· that Sesac has monopoly power in the field of gospel music. And AME has not suggested any manner in which they operated to its injury or otherwise restrained its competition with Sesac. Clearly they played no part in Sesac's successful winning back of the fourteen publishers AME temporarily acquired. AME's own proposal to the publishers was that it would affiliate them with the even bigger performance-rights pools of ASCAP or BMI. So far as we can see, they present no present hindrance to the acquisition or marketing of performance rights by AME. The validity of Sesac's pooling of performance rights and conglomerate licensing practices in the abstract and apart from their effect on AME is not before us; we express no opinion as to whether in a suit by the Government or some other private plaintiff they might be held lawful or unlawful.

Finally, we think the court below correctly dismissed Sesac's counterclaim for unfair competition. It was shown below that Jadassohn made use of his knowledge of Sesac's method of allocating royalties to publishers and of the names of those publishers. The trial judge also found that Poklitar, Jadassohn's successor at Sesac, kept AME informed of defendant's efforts to forestall the AME publisher raid. None of the information Jadassohn carried away with him, however, partakes of the nature of a trade secret. The publishers' names are a matter of public record in the files of the copyright office; and as the 1950 consent decree against ASCAP indicates, a policy of effective competition favors broad knowledge throughout the industry of the terms and systems of allocation of royalties to publishers followed by the performance-rights organizations. United States v. American Society of Composers, Authors and Publishers, Civ. No. 13–95, D.C.S.D.N.Y., 1950—51 CCH Trade Cases ¶ 62,595, § XIII B. See Timberg, The Antitrust Aspects of Merchandising Modern Music, 19 Law & Contemp. Prob. 294, 311–315. Finally, Sesac has shown no damages from Poklitar's activities.

Affirmed.