**C. A. PAGE PUBLISHING CO., Inc., a California corporation, Plaintiff,**

v.

**Telford WORK et al., Defendants.**

**Marietta PAGE, Plaintiff,**

v.

**Telford WORK et al., Defendants.**

**Nos. 14390, 14391.**

United States District Court
S. D. California,
Central Division.

Oct. 21, 1959.

Wright, Wright, Goldwater & Wright, and Dudley K. Wright, Los Angeles, Cal., for plaintiffs.

Rollin L. McNitt and Edythe Jacobs, Los Angeles, Cal., for defendants.

SOLOMON, District Judge.

Each case is now before the court on plaintiffs' motions for partial summary judgment, and on defendants' motions for summary judgment; each motion is directed to the issue of jurisdiction under the Sherman and Clayton Acts. Both cases raise the identical jurisdictional issues, and are treated together. The court has taken testimony in addition to the affidavits of counsel, and the parties are in agreement that all evidence relative to the jurisdictional issue is now before the court.

Plaintiff C. A. Page Publishing Company owns and publishes the Commercial News, a general business newspaper serving the Los Angeles area.

Defendants are a number of community newspapers serving small neighborhoods in and around Los Angeles and the Los Angeles Newspaper Service Bureau together with several of its officers. The Bureau is owned substantially by the defendant newspapers and represents them in the solicitation of legal advertising.

Plaintiff seeks treble damages under the Sherman and Clayton Acts.[1] It claims that collusive and illegal bidding by defendants caused the Commercial News to lose printing contracts for the 1951 and 1954 Los Angeles delinquent tax lists. More particularly, plaintiff contends that defendant newspapers

(1) fixed rates for legal advertising published in their newspapers,

(2) appointed Telford Work to submit collusive and illegal bids,

(3) pooled forces and facilities to print and publish legal advertising so as to be in a position to outbid on public legal advertising all publishers who were not members of the Bureau,

(4) pooled receipts,

(5) sought to restrain the general public from placing legal advertising with non-member newspapers,

(6) sought by threats, intimidation, and duress to destroy non-member newspapers,

(7) divided the market territorially among its members,

(8) placed prohibitive restrictions on new membership,

(9) bought out various non-member newspapers,

(10) succeeded in effectively eliminating competition by non-member newspapers in the publishing of legal advertising.

Plaintiff contends that these activities enabled one of the defendant newspapers to obtain the contract to publish the Los Angeles delinquent tax list on bids of $52,000 in 1951, and $76,000 in 1954, as against plaintiff's bids of $109,000 in 1951 and $120,000 in 1954. Plaintiff estimates that its costs in printing the lists, had it been the successful bidder, would not have exceeded $24,000 for either list. Thus, it seeks over a half million dollars in damages, representing three times its estimated net profit of $85,000 in 1951, and $96,000 in 1954.

In the companion case, consolidated for trial, plaintiff Marietta Page brings a stockholder derivative action on behalf of Consolidated Printing and Publishing Company, the former publisher of the Los Angeles Daily Journal, a newspaper primarily engaged in the publication of legal advertising for the Los Angeles area.

She alleges that defendant newspapers sought to destroy the Journal, a non-member of the Bureau, and by their activities impaired the revenues of the Journal so severely that the owners of Consolidated were forced to sell out for one million dollars less than the former value of the Journal. Thus, plaintiff seeks, for Consolidated, $3,000,000, treble its alleged loss.

[1]. 15 U.S.C.A. §§ 1, 2, 4, 13, 15, 18 and 26.

Plaintiffs argue that a newspaper is by its nature engaged in interstate commerce, and therefore acts which interfere with the normal operation of a newspaper business necessarily affect interstate commerce sufficiently to satisfy the jurisdictional requirements of the Sherman and Clayton Acts.

We may assume that the plaintiff and defendant newspapers are engaged in interstate commerce by virtue of (1) their regular purchases of newsprint from sources outside of California, (2) their carriage of some national news and feature items, (3) their carriage of some national advertising, and (4) a few out-of-state subscribers.

■ However, the test of jurisdiction is not that the acts complained of affect a business engaged in interstate commerce, but that the offensive acts affect the interstate commerce of such business or any business. Furthermore, it is not all economic consequences to interstate commerce which confer jurisdiction but only those anti-competitive consequences which the statutes are designed to prevent.[2]

■ This principle was very well expressed in Mandeville Island Farms v. American Crystal Sugar Co., 1947, 334 U.S. 219, 234, 68 S.Ct. 996, 1005, 92 L.Ed. 1328, where the court stated:

"[G]iven a restraint of the type forbidden by the Act * * * and a showing of actual or threatened effect upon interstate commerce, the vital question becomes whether the effect is sufficiently substantial and adverse to Congress' paramount policy declared in the Act's terms to constitute a forbidden consequence."

In Sears, Roebuck & Company v. Blade, D.C.S.D.Cal.1953, 110 F.Supp. 96, Sears brought a treble damages action against its former Los Angeles advertising manager and several local engravers, arising out of an alleged kick-back arrangement between the manager and his codefendants in the sale to Sears of engravings and mats.

Ample facts appeared to qualify Sears as a business engaged in interstate commerce, and the court so found. Nevertheless, the court dismissed the action on the express ground that the acts complained of were not alleged to have restrained or have tended to restrain these interstate activities in which Sears was engaged. Accord. Feddersen

2. "The word 'affect' is used in two different situations under the antitrust laws. A case under the antitrust laws, so far as the interstate commerce element is concerned may rest on one or both of two theories:

"(1) That the acts complained of, occurred within the flow of interstate commerce. This is generally referred to as the 'in commerce' theory.

"(2) That the acts complained of, occurred wholly on the state or local level, in intrastate commerce, but substantially *affected* interstate commerce.

"Under both of these theories, the transactions complained of must *affect or have an effect* on interstate commerce or the requirements of the statute are not satisfied. Under the 'in commerce' theory, the ultimate effect on interstate commerce is the impact on that commerce under a qualitative and not a quantitative test. If there is price fixing or division of the market involved, there are violations per se, as a matter of law. Where there is involved no price fixing or division of the market, the effect of the transactions complained of may be a question of law or a mixed question of law and fact.

"Turning to the second alternative, where acts wholly within intrastate commerce substantially affect interstate commerce, these * * * acts may occur before goods enter the flow of commerce, or after they leave the flow of commerce. Here we have a question of fact as to whether the wholly intrastate acts substantially affect the flow of commerce.

"After determination of the issue as to whether the wholly intrastate acts substantially affect the flow of commerce, we then reach the same problem that is reached under the 'in commerce' theory, namely the ultimate effect or impact of the acts complained of on interstate commerce and again the test is a qualitative one and not a quantitative test, and again is a question of law, or a mixed question of law and fact." Las Vegas Merchant Plumbers Ass'n v. United States, 9 Cir., 1954, 210 F.2d 732, 739, n. 3.

Motors v. Ward, 10 Cir., 1950, 180 F.2d 519; Boro Hall Corp. v. General Motors, 2 Cir., 1946, 130 F.2d 196, on rehearing. See also Brenner v. Texas Co., D.C.N.D. Cal.1956, 140 F.Supp. 240, 243.

In every case cited by plaintiff involving news media, a defendant had restrained, or attempted to restrain, competition in the interstate market for national news and advertising. Lorain Journal Co. v. United States, 1951, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162; Indiana Farmer's Guide Pub. Co. v. Prairie Farmer Pub. Co., 1934, 293 U.S. 268, 55 S.Ct. 182, 79 L.Ed. 356; Greenspun v. McCarran, D.C.Nev.1952, 105 F.Supp. 662, and United States v. The Times-Picayune Pub. Co., D.C.E.D. La.1952, 105 F.Supp. 670.

In each of these cases, newspapers, enjoying dominant positions in local or regional newspaper markets, utilized various methods outlawed by the Sherman Act, to draw advertising from competing news media, in order to drive competitors out of business and to monopolize local markets for interstate news and advertising.

In Evening News Pub. Co. v. Allied Newspaper Carriers of New Jersey, 3 Cir., 1959, 263 F.2d 715, 718, an association of newspaper carriers utilized its dominant position of the home delivery market to force the Evening News to abandon the use of newsboys in order to restrain and monopolize home deliveries of the News. The court held that the dissemination of national news and advertising was "an essential element of [the newspaper's] being", and that home delivery is "an integral part of the interstate operation".

In the present case, the loss of the delinquent tax list contracts was not alleged to have threatened the normal operation of the Commercial News—a newspaper of general circulation neither primarily devoted to, nor economically dependent upon legal advertising. Thus, although the Commercial News carried substantial amounts of national news and display advertising, there was no interference with the flow of such news and advertising to Commercial News readers. On the other hand, the Los Angeles Daily Journal, which is primarily devoted to legal advertising, carried insignificant quantities of national news and display advertising, so that even if we assume that the original Journal was eliminated as a competitor and the current Journal is a new and distinct entity, the elimination of the Journal also did not interfere with the flow of national news and display advertising.

Furthermore, even if the original Journal had carried substantial news and advertising and even if the Commercial News had been destroyed by defendants' activities, no showing could have been made that the defendants had any control or potential control over the interstate markets for newsprint, national display advertising, or the dissemination of national news. This is no case of creeping monopolization. Klor's Inc., v. Broadway-Hale Stores, 1959, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741. Plaintiffs assert that the defendant newspapers were able to destroy the Journal by the exercise of control over the local legal advertising market. But this control could afford them no leverage to gain control of the interstate markets in newsprint, national news, or national display advertising, no matter how successful their monopoly of the legal advertising market, since the major users of these interstate services and commodities, such as the great metropolitan dailies, are not dependent upon the revenues brought by legal advertising.

If there existed an appreciable interstate market for Los Angeles legal advertising or a Los Angeles market for legal advertisements placed by out-of-state clients, a case might be made out for the anti-competitive effects of defendants' activities on these markets. No such markets exist. The Journal is the only newspaper involved which is primarily devoted to legal advertising. It is the only newspaper involved whose out-of-state readers are particularly interested in legal advertising. The Journal has only 13 out-of-state subscribers,

three of whom are complimentary. Similarly, legal advertisements for out-of-state clients appeared in the Journal regularly, though on a very small scale (averaging 5 items per issue), and a great majority of these items were placed by local counsel. These are not "substantial" or "appreciable" amounts of interstate commerce by any standards, and we hold that these items also come within the maxim *de minimus*. See, e. g. Klor's, Inc. v. Broadway-Hale Stores, supra, 359 U.S. at page 211, 79 S.Ct. at page 708; Mandeville Island Farms v. American Crystal Sugar Co., supra, 334 U.S. at page 234, 68 S.Ct. at page 1005; United States v. Yellow Cab Co., 1946, 332 U.S. 218, 225, 67 S.Ct. 1560, 91 L.Ed. 2010. Cf. Mabee v. White Plains Pub. Co., 1945, 327 U.S. 178, 181, 66 S.Ct. 511, 90 L.Ed. 607; National Labor Relations Board v. Fainblatt, 1938, 306 U.S. 601, 607, 307 U.S. 609, 59 S.Ct. 668, 83 L.Ed. 1014.

Plaintiffs' motions for partial summary judgments are denied, and defendants' motions for summary judgments are granted. Both cases are dismissed. No costs.