Marietta PAGE, Appellant,

v.

Telford WORK et al., Appellees.

No. 16787.

United States Court of Appeals
Ninth Circuit.

March 8, 1961.

Rehearing Denied May 3, 1961.

Dudley K. Wright, Santa Ana, Cal., for appellant.

Rollin L. McNitt and Edythe Jacobs, Los Angeles, Cal., for appellees.

Before CHAMBERS, BARNES and JERTBERG, Circuit Judges.

JERTBERG, Circuit Judge.

Appellant appeals from a judgment dismissing for want of federal jurisdiction a civil antitrust action for treble damages. Jurisdiction of the district court was invoked under the provisions of Title 15 U.S.C.A. §§ 1, 2, 4, 7, 13, 15 and 18, commonly known as the Sherman Antitrust Act and the Clayton Act. This Court has jurisdiction under the provisions of Title 28 U.S.C.A. §§ 1291 and 1294.

Judgment of dismissal was entered following the granting by the district court of appellees' motion for summary judgment based on the ground that there existed no genuine issue on a material fact relating to the question of jurisdiction. To denominate the proceedings leading up to the entry of judgment of dismissal as a motion for summary judgment is somewhat of a misnomer in the light of the record in this case. Following extensive pretrial discovery proceed-

ings and conferences, culminating in a pretrial conference order containing 30 pages of admitted facts, the case was set for trial on its merits. On the day before the trial date the district court inquired of counsel if they were agreeable to submitting the question of jurisdiction on motions for summary judgment. In response to the court's inquiry, counsel for both parties stated that they would be perfectly willing to do so. On the same date oral testimony was taken on one phase of such issue. Thereafter appellees filed their motion for summary judgment on the ground above stated, and appellant filed a motion for partial summary judgment in her favor on the issue of federal jurisdiction. The respective motions were supported by affidavits, stipulated facts, answers to requests for admissions and interrogatories, depositions, exhibits, excerpts from exhibits, and the oral testimony. Following the filing of the motions and briefs and the submission of the issue, the district court stated that the case was before the court on appellees' motion for summary judgment and on appellant's motion for partial summary judgment; that each motion is directed to the issue of jurisdiction under the Sherman and Clayton Acts, and stated, "The court has taken testimony in addition to the affidavits of counsel, and the parties are in agreement that all evidence relevant to the jurisdictional issue is now before the court." [178 F.Supp. 185.]

We are satisfied from the record that all evidence germane to the question of jurisdiction was before the court. The parties appear likewise satisfied since on this appeal appellant does not contend that summary judgment was improper because of the presence of a genuine issue as to a material fact. Each party argues that under the facts before the trial court each is entitled to a judgment as a matter of law on the issue of jurisdiction. We, therefore, conclude that the parties have in effect consented to a separate trial on the issue of jurisdiction. See Gillespie v. Norris, 9 Cir., 1956, 231 F.2d 881. We note that the trial court in

proper circumstances has the right to order separate trials for separate issues in the same case. Federal Rules of Civil Procedure 42(b), 28 U.S.C.A. Hence this opinion will concern itself with the correctness of the legal tests applied by the district court to the findings of fact made by it.

The action is on behalf of Consolidated Printing and Publishing Company, a dissolved corporation (hereinafter referred to as "Consolidated"), as a derivative stockholder's suit. Prior to its dissolution on May 29, 1951, Consolidated was the owner and publisher of the Los Angeles Daily Journal, a newspaper primarily engaged in the publication of legal advertising in the Los Angeles area. Violations of the antitrust law are charged against the appellees, and more particularly appellant contends:

(1) That appellees formed the Los Angeles Newspaper Service Bureau, a California corporation;

(2) That the Bureau fixed prices for public and private legal advertising in Los Angeles County;

(3) That an agent was appointed who submitted collusive bids on public advertising;

(4) That the Bureau members pooled forces and facilities to print public legal advertising, and excluded non-members from participation in these projects;

(5) That Bureau members pooled receipts derived from legal advertising;

(6) That the Bureau endeavored to prevent the general public from placing legal advertising with newspapers not members of the alleged conspiracy;

(7) That the Bureau endeavored to destroy non-members by threats, intimidation and duress;

(8) That the Bureau acquired stock and assets of various non-members;

(9) That the Bureau, by various other means not specified, eliminated competition in the field of public and private legal advertising in Los Angeles County; and

(10) The Bureau divided the market territorially among its members and excluded non-members and excluded one member from the territory of another member.

It is appellant's contention that appellee newspapers sought to destroy the Journal, not a member of the Bureau, and by their activities impaired the revenues of the Journal so severely that Consolidated was forced to dissolve and the stockholders thereof were forced to sell the assets of the Journal of $1,050,-000 less than the former value of the Journal. Appellant seeks treble such amount.

Before proceeding further we will review the necessary background and historical material. The gist of appellant's charges is that the appellees combined and conspired to eliminate the Los Angeles Journal as a competitor in the field of legal advertising in the County of Los Angeles, and to monopolize such market, and did monopolize such market. Legal advertising consists of notices required by California law to be published in newspapers of general circulation within the State of California. Legal advertising is divided into two basic categories: (a) public legal advertising, which consists of notices placed by federal, state, county, city, school district, or other governmental divisions or agencies which are required by law to cause notices to be published in such newspapers; (b) private legal advertising, which consists of notices required by law to be published in connection with the conduct of business within the state or in connection with court or other proceedings pending in the state. In order to qualify under California law to publish legal notices, a newspaper must be a newspaper of general circulation as defined by law. California law requires that such newspaper must be established, printed and published at regular intervals for at least one year in the place where publication is required, and must be adjudicated to be a newspaper of general circulation. The basic purpose of laws requiring publicaton of legal notices

is to have such notices published in the place where it is most likely that they will be read by the persons who might be concerned. Accordingly places of publication of legal notices are often expressly localized by statute, in a court decree, or action of public officials who are responsible for publication.

In the early 1930's Consolidated dominated the legal advertising market in the County of Los Angeles, and had achieved a virtual monopoly of such market. The metropolitan newspapers of the City of Los Angeles, such as the Los Angeles Times, the Los Angeles Examiner, and the Los Angeles Express, were not interested in this field of legal advertising, but a number of small newspapers of general circulation, printed and published in the smaller cities and neighborhood areas within the County of Los Angeles, were interested in participating in this field. Representatives of some of the appellee newspapers called upon officials of the city of Los Angeles and of the County of Los Angeles and sought to participate in the public legal advertising required to be printed by such officials in Los Angeles newspapers. They were advised that it was not feasible for these public officials to deal with a large number of newspapers scattered throughout the City and County of Los Angeles, and that the administrative duties of dealing separately with so many small newspapers was too burdensome. To meet the problem raised by such public officials, and in order to enable small newspaper publishers throughout the County of Los Angeles to compete in this field, some of the appellees caused to be formed in 1934 the Los Angeles Newspaper Service Bureau, a California corporation, (hereinafter referred to as the "Bureau"), in order to enable each newspaper publisher to have a downtown civic center representative, who was authorized to solicit on behalf of appellee newspapers public legal advertising from public officials in Los Angeles County. Each of the appellee newspapers individually used the services of the Bureau under a separate agreement for the solicitation and serv-

icing of private and public legal advertising published in the respective newspaper of each appellee newspaper. Each member of the Bureau was an independent newspaper establishment, and each operated primarily in a local city or neighborhood within the City and within the County of Los Angeles. The subscription list of each such newspaper was drawn primarily from the circulation area in the respective community of the paper. The Bureau also rendered various other types of services for each publisher, such as furnishing information concerning various requirements for publication, customary rates charged for particular types of publication, guidance in the matter of forms to be executed by the publisher in proof of publication, and furnishing forms of business notices to be used in the sale of legal advertising, and instructing and advising on various problems affecting the publication of legal advertising. The Bureau assisted publishers in soliciting of lawyers, title companies, escrow departments, court commissioners, and others who publish legal notices in local newspapers most likely to be seen by the persons affected by such notices, and assisting the publishers in competing for such business. The Bureau from the time of its formation was active in fostering the principle of localization of publication of both private and public legal notices, and representatives of the Bureau frequently appeared before various public officials and legislative bodies constantly seeking greater localization of the publication of legal notices. The record discloses that the efforts of the Bureau to secure greater localization of publication of legal notices were successful.

As a result of the greater localization of publication, the Los Angeles Journal, which was printed and published in the Los Angeles judicial district, became ineligible to compete for the publication of legal notices which were required to be printed and published in some other district, city, or political subdivision of the City of Los Angeles or the County of Los Angeles, although remaining eligible to

compete where the notice was required to be printed and published in a newspaper of general circulation within the Los Angeles judicial district. As a result of the foregoing and other activities of the Bureau, it is charged that the revenues of Consolidated from the Los Angeles Journal became so impaired that by 1951 Consolidated was forced to dissolve and the stockholders were forced to sell the assets of the Journal. These assets of the Journal were purchased from the stockholders of Consolidated by Mutual Newspaper Publishing Company, a corporation (hereinafter referred to as "Mutual"), which has continued the publication of the Los Angeles Daily Journal. The Bureau, and its subsidiary corporation Mutual, are owned substantially by the appellee newspaper publishers.

The appellees are: the owners and publishers of 105 community newspapers serving areas in Los Angeles County, each of whom is and was a member of the Bureau at the time of the filing of the original complaint; the Bureau; Mutual; several officers of said corporations; Consolidated; and stockholders and former directors of Consolidated. Appellant seeks no affirmative relief against Consolidated or its stockholders and directors. Each appellee newspaper is a newspaper of general circulation as defined by California law, and therefore qualified to publish legal notices. Each appellee newspaper is printed and published in one of the cities or neighborhood areas of the County of Los Angeles, and carries primarily news and classified and display advertising. The lineage used in legal advertising in appellee newspapers constitutes a small percentage of the lineage devoted to display and classified advertising. Legal notices required to be published elsewhere than in Los Angeles County are, of course, not published by any of the newspapers herein concerned. The solicitation in Los Angeles County of legal notices for publication outside of California is negligible, and appellant makes no contention that competition in such market has in any way been affected by any of the activities of appellees. The Los Angeles Daily Journal carried only a small amount of display or classified advertising, and its circulation consisted largely of lawyers in Los Angeles County, title companies, escrow companies, and other firms having a need of information concerning court calendars, court filings, and commercial information.

Appellant makes no claim that any activity of appellees caused the Los Angeles Daily Journal to lose subscribers, to lose display or classified advertising, or to lose job printing. Appellant claims loss of revenue to Consolidated only in the field of legal advertising. Appellant makes no contention that competition existed between Consolidated and the appellees in the field of news dissemination or in the field of display and classified advertising. Its sole contention in this regard is that competition existed only in the field of legal advertising.

The record is clear that appellee newspapers and Consolidated were engaged in interstate commerce by virtue of (1) their regular purchases of newsprint and other supplies from sources outside of California; (2) the dissemination of national news; (3) their carrying of national advertising; and (4) a few out-of-state subscribers. The Bureau did not engage in purchasing newsprint or supplies for use of its members, nor did it engage in the printing or publishing of any newspaper. There is no contention on the part of appellant that appellees in any way attempted to monopolize, curtail, interfere with, or affect the movement to or from Consolidated of any of these out-of-state articles or services.

The facts found by the district court are:

"7. Defendant newspapers engage in interstate commerce by virtue of (1) their regular purchases of newsprint from sources outside of California, (2) their carriage of some national news feature items, (3) their carriage of some national advertising, and (4) a few out-of-state subscribers.

"8. Consolidated engaged in interstate commerce by virtue of (1) regular purchases of newsprint from sources outside of California, (2) a few out-of-state subscribers. The Los Angeles Daily Journal, primarily devoted to legal advertising, carried insignificant quantities of national news and display advertising.

"9. Even if Consolidated, former owner of the Los Angeles Daily Journal, had been eliminated as a competitor by reason of the activities of defendants in relation to legal advertising, such elimination of Consolidated as a competitor, would not have interfered with the flow of national news and display advertising in interstate commerce.

"10. No showing was, or could have been made, that the defendants had any control or potential control over the interstate markets for newsprint, national display advertising, or the dissemination of national news.

"11. This is no case of creeping monopolization of any interstate market.

"12. Plaintiff claims that defendant newspapers were able to destroy the Los Angeles Daily Journal by the exercise of control over the local legal advertising market. Such control of the local legal advertising market could afford defendants no leverage to gain control of the interstate markets in newsprint, national news, or national display advertising, no matter how successful a monopoly could be gained of the legal advertising market, since the major users of those interstate services and commodities, such as the great metropolitan dailies in the Los Angeles area, are not dependent upon revenue brought by legal advertising.

"13. No appreciable interstate market exists either for Los Angeles legal advertising or for legal advertisements in Los Angeles placed by out-of-state clients. No such interstate markets exist.

"14. The Los Angeles Daily Journal is the only newspaper involved which is primarily devoted to legal advertising. It is the only newspaper involved whose out-of-state readers are particularly interested in legal advertising. It has only 13 out-of-state subscribers, three of whom are complimentary. Legal advertisments for out-of-state clients appeared in the Journal regularly, though on a very small scale (average 5 items per issue), and a great majority of these items were placed by local counsel. These are not 'substantial' or 'appreciable' amounts of interstate commerce by any standards, and come within the maxim de minimis."

From the findings of fact the district court concluded:

"1. There is no genuine issue as to any of the foregoing facts which are determinative of the cause.

"2. The market involved in the instant case is an intrastate activity which is not in trade or commerce between the states.

"3. The interstate trade or commerce in which plaintiff and defendants engage did not suffer any anti-competitive effects from the acts of defendants of which plaintiff complains.

"4. The activities of defendants with relation to legal advertising did not have any anti-competitive effect on any interstate market.

"5. There is no jurisdiction of the Federal Court in this case under the antitrust laws.

"6. Defendants are entitled to a summary judgment dismissing this action, and Judgment should be entered accordingly."

It is clear from the facts submitted to the district court, and as reflected in the opinion of the district court, C. A. Page Publishing Co. v. Work, D.C., 178

330

F.Supp. 184, and in the findings of fact and conclusions of law, that the product involved in this action is legal advertising in newspapers printed, published and circulated in Los Angeles County, and that the pertinent market in which the parties competed for such product is Los Angeles County.

The district court found that no interstate market exits for legal advertising in newspapers printed, published and circulated in Los Angeles County. The printing and publication of legal notices is limited by law, court decree, or the action of public officials, to newspapers of general circulation printed and published in Los Angeles County. The claimed restraints applied by appellee newspapers and their activities to monopolize or attempt to monopolize the product involved were on a purely local level and were wholly directed to local intrastate market. The finding of the district court is not erroneous, and the court properly concluded that the product involved is not in the flow of interstate commerce.

Appellant's main contention is that the trial court erred in respect to the above finding and above conclusion of the district court. It is appellant's position that the business of printing and publishing newspapers is interstate because newsprint, ink, and other supplies, news items, and advertisements received from outside California become the ingredients, together with local news and local legal and other advertisements, of the newspaper which is printed and published in Los Angeles County and circulated in and out of the State of California, and that legal advertising being an integral part of such newspaper is in the flow of commerce. Even granting the doubtful proposition that a process requiring fundamental and numerous changes in the nature of the product can constitute an uninterrupted flow, appellant's view of the flow of commerce relates to the newspaper business as a whole rather than the relevant market with which we are concerned, which is separate and divisible from other markets in which a newspaper may be engaged. In the antitrust field a relevant market may be narrower than the entire business operation of the business under scrutiny. Thus, the Supreme Court has confined the relevant market of products (flexible packaging materials) of a large enterprise, United States v. E. I. Du Pont De Nemours & Co., 1956, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264. A relevant market has been defined as championship boxing matches, as distinguished from other boxing matches, International Boxing Club v. United States, 1958, 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270; gospel music as distinguished from other music, Affiliated Music Enterprises, Inc. v. Sesac, Inc., D.C., 160 F.Supp. 865, affirmed 2 Cir., 1958, 268 F.2d 13; newspaper advertising as distinguished from circulation, Times-Picayune Pub. Co. v. United States, 1953, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277. In United States v. Yellow Cab Co., 1947, 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010, the Supreme Court held that the Yellow Cab was engaged in interstate commerce in transporting passengers from one railroad station in Chicago to another because of the unique position of Chicago as a terminus for interstate travelers, but the Court also held that the transportation by Yellow Cab from homes in the Chicago area to the railroad station was not in interstate commerce, as the impact of this transportation on interstate commerce was too indirect and fortuitous. The test of jurisdiction is not that the acts complained of affect a business engaged in interstate commerce, but that the conduct complained of affects the interstate commerce of such business.

Appellant makes the argument that the newspaper cases constitute an exception to this general rule. Appellant contends that the newspaper cases seem to lay down a simple rule that if a newspaper is engaged in interstate commerce it is entitled to the protection of the antitrust laws no matter where the particular restraint is applied.

A review of the leading antitrust cases in the newspaper field shows no such uniform rule according newspapers special treatment under the antitrust laws. In Times-Picayune Pub. Co. v. United States, supra, the Supreme Court held that a unit rate plan for commercial advertising in morning and evening newspapers was not invalid under the antitrust laws as a tying agreement, reversing the lower court. The Court considered the position of defendant in the relevant commercial advertising market and carefully restricts its holding to the facts.

In Lorain Journal v. United States, 1951, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162, the Supreme Court found a restraint in interstate trade when the publisher of the only daily newspaper in one community refused to accept advertising from anyone who advertised on a radio station in a neighboring community, finding that the effect of this practice would be to put the radio station, an interstate broadcaster, out of business. In Greenspun v. McCarran, D.C.Nev.1952, 105 F.Supp. 662, concerted withdrawals of advertising by large gambling establishments from one of two Las Vegas newspapers of interstate circulation was held to be a restraint of interstate commerce as an attempt to put one newspaper out of business. In Evening Newspaper Publishing Co. v. Allied Newspaper Carriers, 3 Cir., 1959, 263 F.2d 715, a refusal by delivery dealers to handle any of plaintiff's newspapers unless plaintiff ceased using newsboys for home delivery was held to be a restraint of trade affecting interstate commerce, because it interfered with the interstate business of news and commercial advertising dissemination. In all the above cases a restraint of interstate commerce was found which was determinative of federal jurisdiction. In none of the above cases did the Court hold, as appellant contends, that the interstate character of the newspaper business as a whole was the determing factor for federal jurisdiction.

■ Appellant contends that the district court erred in failing to take into consideration appellant's contentions that appellee newspapers engaged in price fixing and market divisions, which constitute per se violations of Section 1 of the Sherman Act, citing among other cases, United States v. Socony Vacuum Oil Co., 1940, 310 U.S. 150, 60 S.Ct. 811, 84 L. Ed. 1129; and International Salt Co. v. United States, 1947, 332 U.S. 392, 68 S. Ct. 12, 92 L.Ed. 20. Appellant argues that when charges of price fixing and territorial division of a market exist at a local level on a product which never enters the flow of interstate commerce, nevertheless a per se violation of Section 1 has been made out, and that federal jurisdiction attaches, and that the amount of interstate commerce affected by such restraints is immaterial. The so-called qualitative test of the illegal per se doctrine does not itself operate to extend federal jurisdiction under Sections 1 and 2 to purely local restraints applied at a local level to a product which never enters into the flow of interstate commerce. The argument made here by appellant has been squarely rejected by this Court in Las Vegas Merchant Plumbers Ass'n v. United States, 9 Cir., 1954, 210 F.2d 732, 747, where this Court said:

"True, a price fixing conspiracy which operates on or within the flow of interstate commerce affects that commerce as a matter of law. But a price fixing conspiracy at a purely local or interstate level does not, as a matter of law, affect the flow of commerce. Whether a purely local or intrastate conspiracy unreasonably restrains interstate commerce is primarily a factual question, i. e., does the local price fixing conspiracy affect substantially the flow of interstate commerce? If the answer is yes, then only are we concerned with the effect of price-fixing under the per se doctrine. In fact, unless there is a finding that the local and intrastate activities complained of and as alleged in the indictment [complaint] substantially affected interstate commerce, there is no ju-

risdiction in a district court over the alleged Sherman Act violation."

■ There remains the question of whether the intrastate activity of publishing legal notices affects interstate commerce even though it is not in the flow of commerce. It is clear that some wholly local activities by parties neither of whom engage in interstate commerce may nevertheless affect interstate commerce. White Bear Theater Corp. v. State Theater Corp., 8 Cir., 1942, 129 F. 2d 600. "If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze." United States v. Women's Sportswear Mfrs' Ass'n, 1949, 336 U.S. 460, 69 S.Ct. 714, 716, 93 L.Ed. 805.

However, despite the increased thrust of federal commerce power as business operations become more interrelated and complex, the courts have consistently required that in order for federal antitrust jurisdiction to be sustained the effect on interstate commerce of an alleged antitrust violation in a local area must be direct and substantial, and not merely inconsequential, remote or fortuitous. Mandeville Island Farms v. American Crystal Sugar Co., 1948, 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328; Foster & Kleiser Co. v. Special Site Sign Co., 9 Cir., 1936, 85 F.2d 742; Atlantic Co. v. Citizens Ice & Cold Storage Co., 5 Cir., 1949, 178 F.2d 453; Spears Free Clinic & Hospital for Poor Children v. Cleere, 10 Cir., 1952, 197 F.2d 125; Elizabeth Hospital, Inc. v. Richardson, 8 Cir., 1959, 269 F.2d 167, certiorari denied 361 U.S. 884, 80 S.Ct. 155, 4 L.Ed.2d 120.

Appellant contends that there was direct and substantial injury to the interstate newsprint market. The argument that the newsprint market suffered because Consolidated ceased buying newsprint when it went out of business is not convincing. There is no indication that Mutual, operating the same newspaper, purchased any less newsprint from out of state. Appellees were in no position to nor did they restrict competition in the newsprint market. Uncontested facts show that the Bureau did not purchase newsprint for its members, and there was no evidence that appellees did anything to interfere with newsprint purchases by Consolidated. Newsprint is only one of many ingredients in a newspaper, which is a separate product from the ingredients of which it is composed. Newsprint is not the product involved in this case.

■ The district judge found that control of the product of legal advertising in the relevant market offered no foothold to appellees to gain control of the interstate markets in national display advertising, news dissemination or newsprint, since the chief competitors in these products—metropolitan newspapers —did not depend on publication of legal notices for revenue. This finding is not clearly erroneous. This case is unlike Lorain Journal v. United States, supra, or Greenspun v. McCarran, supra, in which dominance in the local commercial advertising market was used to cut off the revenue of a competitor, driving him out of an interstate business. Commercial advertising is not involved in this case. The commercial advertising market is so different that it cannot be analogized to the publication of legal notices. In the field of legal advertising the advertiser—be it a public official or private person—is in an entirely different situation as were private advertisers in the Lorain Journal and the Greenspun cases. Public authority determines when, where and how legal notices will be published. In the absence of evidence to the contrary it must be presumed that public power has been properly exercised.

■ Appellant contends that appellees restrained competition in interstate circulation. The trial judge concluded that 13 out of 4000 subscribers, three complementary, is de minimis. We find nothing to indicate that this finding is clearly erroneous. None of the activities of appellees made information contained in the Los Angeles Daily Journal unavailable to these 13 subscribers. Prior to the dissolution of Consolidated appellees did nothing to restrict the out-of-state circulation of the Journal.

In our view the district court properly concluded that the effect of the activities of appellee newspapers in the local market on those interstate activities in which Consolidated and appellees were also engaged were indirect and non-existent, and no sustantial effects were felt in the interstate markets of newsprint purchase, national and display advertising, national news dissemination and circulation.

We argee with the statement of the district court that this is no case of creeping monopolization. See Klor's, Inc. v. Broadway-Hale Stores, Inc., 1959, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741, and Radiant Burners, Inc., v. People's Gas Light & Coke Company et al., 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358.

Appellant states that "Even were defendants' activities not a violation of Sections 1 and 2 of Title 15 U.S.C., Plaintiff on behalf of Consolidated can recover for the injury caused by defendants' clear violation of Section 18 of Title 15 U.S.C." Appellant complains that the trial court did not even consider the Section 18 aspect of the case. Section 18 in applicable parts is as follows:

> "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

> "No corporation shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of one or more corporations engaged in

commerce, where in any line of commerce in any section of the country, the effect of such acquisition, of such stocks or assets, or of the use of such stock by the voting or granting of proxies or otherwise, may be substantially to lessen competition, or to tend to create a monopoly. * * "
Title 15 U.S.C.A. § 18.

It is to be noted that the plain language of the statute is to prohibit the acquisition by one corporation of the capital stock or assets of another corporation "where in any line of *commerce in any section of the country,* the effect of such acquisition * * * may be substantially to lessen competition, or to tend to create a monopoly." (Italics added.) The purpose in the enactment of Section 18 was to cope with monopolistic tendencies in their incipiency, which were beyond the reach of the Sherman Act as judicially interpreted. See American Crystal Sugar Co. v. Cuban-American S. Co., 2 Cir., 1958, 259 F.2d 524, and also the Report of the Attorney General's National Committee to Study the Anti-trust Laws, March 31, 1955, page 115 et seq. We recognize that the general language of the Sherman Act and of the Clayton Act was designed by Congress to exercise its powers under the Commerce Clause of the Constitution, U.S.Const. art. 1, § 8, cl. 3, to the fullest extent, nevertheless, it must be interstate commerce which feels the pinch, or competition in interstate commerce which may be substantially lessened, or where there is a tendency toward the creation of a monopoly in interstate commerce, before the provisions of said sections become applicable.

In our view, the language of Section 18 in no way indicates that Congress intended to apply the provisions of that Act to purely local activities wholly directed to a local intrastate market and relating to a product not in the flow of interstate commerce and where the effects on interstate activities in which the parties engage are insubstantial, incon-

**334**

sequential and fortuitous, if not non-existent.

The judgment of the district court is affirmed.

On Petition for Rehearing.

PER CURIAM.

An opinion was filed herein on March 8, 1961, affirming the judgment of the district court dismissing for want of federal jurisdiction a civil antitrust action.

On petition for rehearing, appellant asserts that we erred in our characterization of the procedural issues on appeal and in respect to the application of the rules of law stated in our opinion. We have reread the voluminous record in this case and concede that we may have been in error in holding that appellant, in effect, consented to a separate trial before the court on the separated issue of jurisdiction. This conclusion, however, does not require a reversal of the judgment.

■ Appellees made a timely motion for a summary judgment on the issue of jurisdiction. If the district court correctly concluded that appellees were entitled to a summary judgment, appellant cannot complain of the deprivation of a jury trial. Fidelity & Deposit Co. of Maryland v. United States, 1902, 187 U.S. 315, 23 S.Ct. 120, 47 L.Ed. 194; Lindsey v. Leavy, 9 Cir., 1945, 149 F.2d 899; Moore, Federal Practice, Vol. 6, § 56.06, pages 2037–2042. Appellees were entitled to a summary judgment on the question of federal jurisdiction if no genuine issue existed as to any material fact and if the moving party was entitled to a judgment as a matter of law. Rule 56, Federal Rules of Civil Procedure, 28 U.S.C.A.

■ Two different theories of interstate commerce were presented to the district court on the cross motions for summary judgment. The district court rejected appellant's theory and adopted appellees' theory. We affirmed for the reasons given in our opinion. Thus, the only question now before us is whether under appellees' theory of interstate commerce a genuine issue existed as to any material fact. We are not concerned with the existence of a fact issue under appellant's theory of interstate commerce, which was rejected by the district court. See Walling v. Richmond Screw Anchor Co., 2 Cir., 1946, 154 F.2d 780; Amaya v. Stanolind Oil & Gas Co., D.C. S.D.Tex.1945, 62 F.Supp. 181, affirmed 5 Cir., 1946, 158 F.2d 554; Moore, Federal Practice, Vol. 6, § 56.13, page 2092. We are satisfied from our reexamination of the record that there exists no genuine issue as to any material fact under appellees' motion for a summary judgment and that appellees were entitled to a judgment of dismissal of the action as a matter of law.

We have re-examined appellant's contentions that we erred in the application of principles of law, but are not persuaded to change the views expressed in our opinion.

The petition for rehearing is denied.